**NATIVE VILLAGE OF ELIM, Nome Eskimo Community, and Kawerak, Inc., Appellants,**

v.

**STATE of Alaska and Frank Rue, in his official capacity as Commissioner of Fish and Game, and Peninsula Marketing Association, Appellees.**

No. S–8135.

Supreme Court of Alaska.

Oct. 15, 1999.

Heather R. Kendall–Miller, Native American Rights Fund, Anchorage, William E. Caldwell, Alaska Legal Services Corporation,

Fairbanks, and John Sky Starkey, Bethel, for Appellants.

Lance B. Nelson, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellees State of Alaska and Frank Rue.

Michael A.D. Stanley, Juneau, and Marc D. Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Washington, for Appellee Peninsula Marketing Association.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, and BRYNER, Justices.

*OPINION*

BRYNER, Justice.

The Native Village of Elim appeals a grant of summary judgment in favor of the Alaska Board of Fisheries and Peninsula Marketing Association. Elim argues that the Board violated its duties under the sustained yield clause of the Alaska constitution by failing to identify a specific yield of salmon to be sustained. Elim also argues that the Board has violated its duty under the state subsistence law to identify chum salmon in individual communities of Norton Sound as separate subsistence stocks and to apply the subsistence preference throughout the stocks' migratory range. Finally, Elim argues that the Board's mixed stock policy is invalid. These arguments implicate the scope of the Board's discretion in its role as manager of Alaska's fisheries. We conclude that the Board acted within the considerable discretion afforded it by the sustained yield clause and the subsistence law, and that the mixed stock policy is valid. Consequently, we affirm the superior court's order.

I. *FACTS AND PROCEEDINGS*

The False Pass fishery commercially harvests salmon that pass through the False Pass area of the South Alaska Peninsula and the Aleutian Islands in June. Because the False Pass fishery harvests various stocks in coastal waters before they have segregated by river of origin, it is classified as a "mixed stock," or "interception" fishery.[1] Although

---

1. *See Peninsula Mktg. Ass'n v. State,* 817 P.2d  917, 918 (Alaska 1991).

the False Pass fishery primarily targets sockeye salmon, the harvest involves an incidental catch of chum salmon that are migrating through the same area. Chum salmon is a subsistence resource for the Native Village of Elim and other communities in Norton Sound, an area several hundred miles north of the False Pass fishery. The Native Village of Elim, the Nome Eskimo Community, and Kawerak, Inc. (collectively "Elim") contend that many of the chum intercepted in the False Pass fishery are bound for Norton Sound. The Alaska Board of Fisheries and the Peninsula Marketing Association[2] (PMA) dispute Elim's characterization of the effect of the incidental chum harvest in the False Pass fishery on the chum returns in Norton Sound. This case represents the third time that this court has considered aspects of the decades-long conflict between these northern subsistence interests and southern commercial interests.[3]

Since 1975 the Board of Fisheries has managed the False Pass fishery under a plan that allots a specific percentage of the projected northern catch of sockeye to the fishery. Following large incidental harvests of chum salmon in 1982 and 1983, the Board imposed "chum caps" directing the Alaska Department of Fish and Game to close the False Pass fishery whenever the incidental take of chum salmon reached the level set by the Board, even if the fishery had not yet harvested its full sockeye allotment.[4] In the decades before and after the Board adopted these caps, the number of chum salmon returning to northern Norton Sound dramatically decreased. In response to this decline, the Board imposed various regulatory measures in Norton Sound, including closing local commercial and sport fisheries and severely restricting subsistence fisheries.

In 1992 Elim sued the Board, alleging that the False Pass fishery is the cause of the chum salmon decline. Elim argued that Alaska's subsistence law requires the Board to restrict or eliminate the False Pass fishery in order to preserve subsistence use of chum in Norton Sound. PMA intervened on the Board's behalf. The superior court denied Elim's request for a preliminary injunction. In October 1992 the court remanded to the Board after the Alaska legislature amended the subsistence law and enacted a new law on mixed-stock fisheries.

Minimal northern chum returns in 1993 spawned a series of legal and political battles between Elim, the Board, and PMA.[5] Elim amended its 1992 complaint to include claims under the sustained yield clause of the Alaska constitution and the mixed stock policy law.[6] Elim wanted the Board to adopt a lower chum cap but the Board declined to do so.[7] Consequently, in January 1995 Elim moved for partial summary judgment in the superior court on its claim that the Board had failed to meet its legal obligations under the 1992 remand order. The Board and PMA filed cross-motions for summary judgment. The superior court granted Elim's motion in part. Retaining jurisdiction, the court remanded to the Board for further findings justifying its actions using either a scientific/rational approach or a historical analysis.

After this second remand, the Board reviewed its management plan for the False Pass fishery. The Board chose not to reduce the chum cap, but directed the Department of Fish and Game to manage the False Pass fishery under sustained yield principles. The Board also delayed the fishery's opening day, eliminated the chum "trigger" so that the

2. The Peninsula Marketing Association is a nonprofit corporation that represents the interests of commercial fishers of the Alaska Peninsula. *See id.* at 918 n. 2.

3. *See Peninsula Mktg. Ass'n v. Rosier*, 890 P.2d 567 (Alaska 1995); *Peninsula Mktg. Ass'n v. State*, 817 P.2d 917 (Alaska 1991).

4. *See Rosier*, 890 P.2d at 568 (discussing history of the Board's actions with respect to the relationship between the False Pass fishery and the northern subsistence fisheries).

5. *See id.* at 568–70 (describing these events in detail).

6. Elim also alleged that the Board had violated the equal access provision of the Alaska constitution, the Open Meetings Act, AS 44.62.310–.312, and the Administrative Procedure Act, AS 44.62.010–.950. Elim eventually abandoned these claims.

7. *See Rosier*, 890 P.2d at 569–70.

chum protections would be implemented from the beginning of the season, and provided that the fishery would close during the last few days of June if the sockeye to chum ratio was less than 2:1 during a specified time period. The Board continued to restrict commercial, sport, and subsistence fishing in Norton Sound. In 1997, after reviewing these actions, the superior court granted summary judgment for the Board and PMA. Elim appeals.

## II. *DISCUSSION*

### A. *The Sustained Yield Clause of the Alaska Constitution*

#### 1. *Standard of review*

■ We review a lower court's decision to grant summary judgment de novo.[8] When we interpret the Alaska constitution and pure issues of law, we substitute our judgment for that of the Board.[9] We interpret the constitution and Alaska law according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters.[10]

■ When we determine whether the Board properly applied the law to a particular set of facts, we review the Board's action for reasonableness.[11] Under this standard, we "merely determine[] whether the agency's determination is supported by the facts and is reasonably based in law."[12] This court will not substitute its judgment for the

Board's or alter the Board's policy choice when the Board's decision is based on its expertise.[13]

#### 2. *The sustained yield clause is a broad principle of management that does not require the Board to determine a numerical yield for fisheries.*

■ The sustained yield clause of the Alaska constitution provides:

Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses.[14]

Elim contends that the Board failed to properly apply the sustained yield clause in managing the False Pass fishery, arguing that the sustained yield clause requires the Board to take three distinct actions: first, identify the level of yield to be sustained for each fish stock or population; second, identify management principles necessary to sustain those levels of yield; and third, consciously apply those principles "insofar as practicable." The Board responds that the sustained yield clause does not require a mathematically precise determination of sustained yield. In the Board's view, its management plan for the False Pass fishery, 5 Alaska Administrative Code (AAC) 09.365, properly incorporates sustained yield principles.[15]

8. See *Stepovak–Shumagin Set Net Ass'n v. State, Bd. of Fisheries*, 886 P.2d 632, 636 (Alaska 1994).

9. See *Moore v. State, Dep't of Transp. and Pub. Facilities*, 875 P.2d 765, 767–68 (Alaska 1994).

10. See *Alaska Wildlife Alliance v. Rue*, 948 P.2d 976, 979 (Alaska 1997).

11. See *Hammer v. City of Fairbanks*, 953 P.2d 500, 504 (Alaska 1998).

12. *Id.* (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

13. *See id.*

14. Alaska Const. art. VIII, § 4.

15. 5 AAC 09.365 provides in part:

(a) Mixed stocks of salmon bound for distant systems have historically been intercepted in significant numbers along the Alaska Peninsula. To ensure that none of these runs are overharvested it is necessary to restrain their interception as provided for in the management plan for the South Unimak and Shumagin Islands June fisheries, set out in this section. (b) The Alaska Board of Fisheries (board) has established sockeye salmon guideline harvest levels on the South Unimak and Shumagin Islands interception fisheries during June, which are based on percentages of the latest projected Bristol Bay inshore sockeye salmon harvest as published by the department.... (2) ... Consistent with the board's Policy for the Management of Mixed Stock Salmon Fisheries set out in 5 AAC 39.220 and traditional harvest patterns, the maximum percentage of the sockeye salmon harvest allowed for the South Unimak fishery is 6.8 percent and for the Shumagin Islands fishery, 1.5 percent.

The forecasts for Bristol Bay are sometimes updated as more information becomes available, just before the South Unimak and Shumagin Islands season, and exact numbers of fish cannot be given before the opening of each fishery.

. . . .

(d) On June 10, the commissioner may open, by emergency order, a commercial fishing period for sockeye salmon for six hours. If the ratio of sockeye salmon to chum salmon is two to one or greater, the commissioner may extend the fishing period by emergency order. Subsequent fishing periods for the South Unimak and Shumagin Islands June fisheries shall be established to allow commercial fishing when the ratio of sockeye salmon to chum salmon indicates that chum salmon harvest will be minimized. Fishing time for commercial set gillnet gear is specified in (g) of this section.

(e) The South Unimak and Shumagin Island June salmon fisheries target on the more abundant and valuable sockeye salmon. The board recognizes that the harvest of other salmon species is incidental to the sockeye salmon harvest. The board has determined that this incidental harvest is unavoidable and cannot be regulated with the present level of knowledge regarding these fisheries. The board will not support any significant increase in the interception rate of chum salmon taken in the South Unimak and Shumagin Islands June salmon fisheries. These stocks are probably fully utilized in existing terminal fisheries of long standing. This determination is consistent with the philosophy contained in the board's Policy For The Management of Mixed Stock Salmon Fisheries (5 AAC 39.220). The board recognizes that the conservation and allocation of nontargeted salmon stocks may be a concern during some years, but does not have the data to ensure specific corrective action at this time (January 1990).

(f) The commissioner shall close, by emergency order, the June fisheries before the sockeye salmon guideline harvest levels are taken if the guideline harvest level of chum salmon specified in (k) is reached. The department shall take appropriate inseason management action under AS 16.05.060 to manage the chum salmon harvest within the guideline harvest established by the board while attempting to allow full harvest of the sockeye salmon guideline harvest level.

(g) In taking management action under (f) of this section to reduce the chum salmon harvest, the commissioner may not set fishing periods for set gillnet gear of less than 16 hours unless a fishing period of 16 hours or more would result in a harvest that exceeds the guideline harvest level for chum salmon specified in (k) of this section. If the ratio of sockeye salmon to chum salmon in a commercial fishing period for set gillnet gear is equal to or greater than the recent 10–year average, as determined by the department, the commis-

sioner may establish additional or extended fishing periods by emergency order.

(h) After June 24, in either the South Unimak or Shumagin Islands fishery, if the sockeye salmon guideline harvest level under (b) of this section and the maximum allowable incidental harvest of chum salmon under (f) of this section have not been attained, and if the ratio of sockeye salmon to chum salmon is two to one or less on any day, the next daily fishing period for seine and drift gillnet gear shall be of six-hour duration in that fishery. After June 24, the South Unimak or Shumagin Islands fishery shall close for all gear types if the ratio of sockeye salmon to chum salmon is two to one or less for any three aggregate days. It is the board's intent to demonstrate by this subsection that the maximum or less harvest of 700,-000 chum salmon supersedes attempts to reach the sockeye salmon guideline harvest levels.

(i) All salmon caught by a CFEC permit holder must be retained, and each CFEC permit holder must report the number of salmon caught, including those taken but not sold, on an ADF & G fish ticket. For the purposes of this section, "caught" means brought on board the vessel.

(j) The board will, to the extent practicable, consider the following guiding principles when taking actions associated with the adoption of regulations regarding chum salmon stocks in the South Unimak and Shumagin Islands June Salmon Management Plan:

(1) the conservation and sustained yield of healthy salmon resources and maintenance of the habitat and ecosystem on which salmon and allied species depend for survival throughout their life-cycle;

(2) the maintenance of viable and diverse fish species and stocks;

(3) the maintenance of the genetic diversity of fish species and stocks;

(4) the best available information presented to the board;

(5) the capability of being implemented and evaluated, including factors such as flexible and adaptive management, conflict with other law, and mixed stock management;

(6) the capability of providing tangible benefits to user groups or conservation, with the least risk to existing fisheries and to conservation; and

(7) the stability and viability of subsistence, commercial, sport, and personal use fisheries.

(k) If the harvest projection of the Arctic–Yukon–Kuskokwim summer chum salmon index group is

(1) less than the 33 percentile of the catches of the index group from 1970 to the present, the chum salmon guideline harvest level is from 350,000 to 450,000 chum salmon; the department shall manage for a guideline harvest level of 400,000 to 450,000 chum salmon; if the department identifies a management concern for summer chum salmon within the Arctic–Yukon–Kuskokwim region, the department shall manage the June fishery inseason for a

We agree with the Board that the sustained yield clause does not require it to determine a specific level of yield for each fish stock. The plain language of the provision requires resource managers to apply sustained yield principles; it does not mandate the use of a predetermined formula, quantitative or qualitative. As a practical matter, the record suggests that to require the Board to devise such a formula would consume an amount of time, money, and energy wholly disproportionate to potential benefits. Moreover, the record supports the Board's contention that the exercise would be a counterproductive use of resources and would limit the in-season flexibility that fisheries management requires.

We acknowledge that the framers of Alaska's constitution intended the sustained yield clause to play a meaningful role in resource management.[16] But at the same time, they believed that calculating a specific numerical yield for fisheries would be impossible. The framers underscored this belief in the glossary that they prepared for use during the constitutional convention, which includes the following discussion of the sustained yield principle:

> As to forests, timber volume, rate of growth, and acreage of timber type can be determined with some degree of accuracy.

For fish, for wildlife, and for some other replenishable resources such as huckleberries, as an example, it is difficult or even impossible to measure accurately the factors by which a calculated sustained yield could be determined. Yet the term "sustained yield principle" is used in connection with management of such resources. When so used it denotes conscious application insofar as practicable of principles of management intended to sustain the yield of the resource being managed. That broad meaning is the meaning of the term as used in the Article.[17]

Elim argues for rigid enforcement of this passage: resource managers must calculate a precise yield to be sustained where such a calculation is "practicable." But Elim reads this passage too literally. The glossary is a useful tool for determining the framers' intent. Yet when read in the context of the framers' discussions of resource management, the phrase "insofar as practicable" cannot fairly be construed to support the kind of mechanical application of the sustained yield principle that Elim proposes. To the contrary, the primary emphasis of the framers' discussions and the glossary's definition of sustained yield is on the flexibility of the sustained yield requirement and its sta-

guideline harvest level of 350,000 to 400,000 chum salmon;

(2) more than the 33 percentile, but less than the 67 percentile, of the catches of the index group from 1970 to the present, the chum salmon guideline harvest level is from 450,001 to 550,000 chum salmon; the department shall manage for a guideline harvest level of 500,000 to 550,000; if the department identifies a management concern for summer chum salmon within the Arctic–Yukon–Kuskokwim region, the department shall manage the June fishery inseason for a guideline harvest level of 450,-001 to 500,000 chum salmon;

(3) more than the 67 percentile of the catches of the index group from 1970 to the present, the chum salmon guideline harvest level is from 550,001 to 650,000; the department shall manage for a guideline harvest level of 600,000 to 650,000; if the department identifies a management concern for summer chum salmon within the Arctic–Yukon–Kuskokwim region, the department shall manage the June fishery inseason for a guideline harvest level of 550,-001 to 600,000 chum salmon.

(*l*) For the purposes of this section,

(1) "management concern" means a chronic inability, despite the use of specific management measures, to maintain escapement objectives; the term "chronic" refers to the continuing or anticipated inability to meet escapement objectives over a four year period, which is generally equivalent to a life cycle or generation of chum salmon;

(2) "Arctic–Yukon–Kuskokwim summer chum salmon index group" includes salmon taken in the Yukon summer chum salmon commercial and subsistence fisheries, the Kotzebue commercial fishery, the Norton Sound commercial fishery, and Kuskokwim commercial fishery.

**16.** *See* 4 Proceedings of the Alaska Constitutional Convention (PACC) 2456–57 (January 17, 1956).

**17.** *Papers of Alaska Constitutional Convention, 1955–1956,* Folder 210, Terms; *see also Hootch v. Alaska State–Operated Sch. Sys.,* 536 P.2d 793, 800 (Alaska 1975) (while framers' purposes are not necessarily conclusive, a historical perspective is essential to an enlightened contemporary interpretation of the Constitution); *State v. Gonzalez,* 825 P.2d 920 (Alaska App.1992), *aff'd,* 853 P.2d 526 (Alaska 1993).

tus as a guiding principle rather than a concrete, predefined process.

The record supports the Board's contention that the nature of the fishery resource in this case precludes a mathematically precise calculation of sustained yield. According to the record, much scientific uncertainty exists in fisheries management. Moreover, as the Board argues, no scientific study has shown that the False Pass fishery has any significant impact on the subsistence fishery in Norton Sound. Even if related, the two fisheries—one near the Alaska Peninsula and the other in Norton Sound—are separated by hundreds of miles of open ocean and international waters. The salmon in these waters are subject to numerous pressures, any one of which could account for a population decrease in a given year.[18] A short and incomplete list of these factors includes weather, natural predators, competition with other fish, international fishing efforts, water pollution, and improved efficiency of fleets and fishing methods. Moreover, several different species of salmon travel through the False Pass fishery, thus creating a "mixed stock" that increases the challenges of management. The record also shows that the salmon operate on a fluctuating cycle that makes estimating returns from year to year difficult even under the best conditions. Elim concedes that the Board "did not have the detailed scientific data necessary to calculate a maximum sustainable level of yield for the[ ] chum stocks with mathematical precision." Given these limitations, the Board reasonably concluded that it need not calculate a precise numerical yield of salmon to be sustained, but need only apply principles intended to sustain yield.

Here the record supports the conclusion that the False Pass fishery management plan applies the sustained yield principle "insofar as practical." In the management plan, the Board adopted seven principles intended to sustain yield. These principles guide the Board's decision-making with respect to the False Pass fishery.[19] The plan also contains specific statements setting forth the Board's intent to diminish the interception of salmon and, specifically, to disallow significant increases in the interception of chum salmon.[20] And all evidence indicates that the Board relied on a rational approach to developing and implementing its management goals. The Board commissioned studies and reviewed others to determine the health of the fisheries. It also adopted a number of concrete measures designed to sustain the salmon runs when evidence indicated that they were in decline: closing and/or severely restricting the commercial, sport, and subsistence fisheries; modifying the fishing season; and imposing chum caps, a permit system, and restrictive gear requirements. In its 1996 review of these measures and scientific studies, the Board concluded that "further reductions in the June area M fishery would not alleviate the remaining conservation concerns for [the specific] rivers."

The Board must balance economic, ecological, cultural, international, and other policy concerns when it makes decisions about Alaska's fisheries. It must accommodate all of these legitimate interests in the face of substantial scientific uncertainty. Moreover, it is the Board's role to reach this accommodation. Courts are singularly ill-equipped to make natural resource management decisions. Consequently, we do not substitute our judgment for that of the Board's.[21] Our review of the record does not

---

18. See Alaska Dep't of Fish & Game, *Issue Paper on Mixed Stock Management* (Mar. 16, 1993) 7–8. ("It should be recognized that changes in mixed stock fisheries can occur in several ways. An increase in the number of gear units, changes in the distribution of effort within the available fishing area or fishing season, and fleet improvements in terms of vessel capacity, gear, and technological advances can all increase fleet efficiency. Effort in a mixed stock fishery may expand as a result of increases in salmon abundance resulting from enhancement activities or natural fluctuations. . . . In reviewing the conduct of mixed stock fisheries, it may be difficult to precisely measure changes due to data uncertainties.").

19. See 5 AAC 09.365(j), *supra* note 15.

20. See 5 AAC 09.365(a), (d)-(h), *supra* note 15.

21. See *Stepovak–Shumagin Set Net Ass'n v. State, Bd. of Fisheries*, 886 P.2d 632, 637 (Alaska 1994); *Meier v. State, Bd. of Fisheries*, 739 P.2d 172, 174 (Alaska 1987).

persuade us that the Board has abused its considerable discretion in developing a sustained yield policy for the False Pass fishery as promulgated in the Board's regulation, 5 AAC 09.365. In the absence of evidence that the Board reached its conclusions arbitrarily, we must defer to the Board's decision.

## B. The Subsistence Law Issues

Alaska Statute 16.05.258 ("the subsistence law") requires the Board to identify fish stocks that Alaskans traditionally use for subsistence and then implement measures to protect those stocks from overharvesting and other threats.[22] Pursuant to this statute, the Board promulgated 5 AAC 01.186, which

identified the subsistence resource in Norton Sound as "salmon, and all finfish other than salmon [except certain herring] in the Norton Sound–Port Clarence Area." [23]

According to Elim, this regulation's shortcomings are threefold. First, Elim argues that its geographic focus is too broad: the regulation identifies all of Norton Sound as the subsistence area, whereas Elim claims that the legally relevant areas are separately the Nome and Moses Point subdistricts. Second, Elim challenges the Board's decision to consolidate the subsistence resource into one group—salmon—instead of recognizing chum salmon within each subdistrict as a separate subsistence resource. Third, Elim

22. AS 16.05.258 provides in relevant part:

(a) Except in nonsubsistence areas, the Board of Fisheries and the Board of Game shall identify the fish stocks and game populations, or portions of stocks or populations, that are customarily and traditionally taken or used for subsistence....
(b) The appropriate board shall determine whether a portion of a fish stock or game population identified under (a) of this section can be harvested consistent with sustained yield. If a portion of a stock or population can be harvested consistent with sustained yield, the board shall determine the amount of the harvestable portion that is reasonably necessary for subsistence uses and
(1) if the harvestable portion of the stock or population is sufficient to provide for all consumptive uses, the appropriate board
(A) shall adopt regulations that provide a reasonable opportunity for subsistence uses of those stocks or populations;
(B) shall adopt regulations that provide for other uses of those stocks or populations, subject to preferences among beneficial uses; and
(C) may adopt regulations to differentiate among uses;
(2) if the harvestable portion of the stock or population is sufficient to provide for subsistence uses and some, but not all, other consumptive uses, the appropriate board
(A) shall adopt regulations that provide reasonable opportunity for subsistence uses of those stocks or populations;
(B) may adopt regulations that provide for other consumptive uses of those stocks or populations; and
(C) shall adopt regulations to differentiate among consumptive uses that provide for a preference for the subsistence uses, if regulations are adopted under (B) of this paragraph;
(3) if the harvestable portion of the stock or population is sufficient to provide for subsistence uses, but no other consumptive uses, the appropriate board shall

(A) determine the portion of stocks or populations that can be harvested consistent with sustained yield; and
(B) adopt regulations that eliminate other consumptive uses in order to provide a reasonable opportunity for subsistence uses; and
(4) if the harvestable portion of the stock or population is not sufficient to provide a reasonable opportunity for subsistence uses, the appropriate board shall
(A) adopt regulations eliminating consumptive uses, other than subsistence uses;
(B) distinguish among subsistence users....

23. 5 AAC 01.186 (1993) provided:

The Alaska Board of Fisheries finds that herring and herring roe along the coast between Point Romanof and Cape Prince of Wales and along the coast of Saint Lawrence Island, and salmon in the Norton Sound–Port Clarence Area, are customarily and traditionally taken or used for subsistence.
See also 5 AAC 01.150 ("The Norton Sound–Port Clarence Area includes all waters of Alaska between the latitude of the westernmost tip of Cape Prince of Wales and the latitude of Canal Point Light, including the waters of Alaska surrounding St. Lawrence Island and those waters draining into the Bering Sea.").
5 AAC 01.186 was amended in 1996 and again in 1998, and currently provides:
(a) The Alaska Board of Fisheries (board) finds that the following fish stocks are customarily and traditionally taken or used for subsistence:
(1) herring and herring roe along the coast between Point Romanof and Cape Prince of Wales and along the coast of Saint Lawrence Island; and
(2) salmon, and all finfish other than salmon, except as specified in (1) of this subsection, in the Norton Sound–Port Clarence Area.
(b) The board finds that 96,000—160,000 salmon are reasonably necessary for subsistence uses in the Norton Sound–Port Clarence Area.

argues that the Board has a duty to apply the subsistence preference throughout the migratory range of a fish stock that it has identified as a subsistence resource.

■ This court reviews the Board's interpretation of its own regulation under the reasonable basis standard.[24] To the extent that this court's review requires it to determine the meaning of the subsistence law, AS 16.05.258, this court exercises independent judgment.[25]

1. *Geographic scope*

■ Under the subsistence law, the Board makes subsistence determinations by studying the socio-economic characteristics of an "area or community"[26] within which the Board proposes to regulate subsistence use. The term "area or community" is broad enough to encompass several subdistricts grouped together. The subsistence law leaves the determination of which geographic boundaries constitute a subsistence area or community to the discretion of the Board.

■ Our interpretation of the "area or community" standard is supported by the state attorney general, who commented in a 1992 opinion that the subsistence law allowed the Board considerable discretion in fixing a geographical boundary.[27] The attorney general maintained that the Board's discretion was limited by two principles: first, the boundaries that the Board ultimately adopts must be reasonably related to the twelve criteria; second, the boundaries must be consistent with the legislature's purpose to provide a preference for subsistence uses.[28]

■ We agree with this statement of the Board's duties, and conclude that the Board fulfilled these duties here. The geographical grouping in Norton Sound conforms to administrative subsistence management areas. The same units are used for commercial and sport fishing management. In fact, the subsistence area used to be much larger, but the Board divided it in 1993.

To illustrate why the Board properly has discretion with respect to geographical boundaries, we note that some concerns support the identification of a larger area as opposed to a smaller area as the relevant subsistence base. For example, commenting on the 1986 subsistence law, Senate staff

---

24. *See Payton v. State*, 938 P.2d 1036, 1041 (Alaska 1997).

25. *See id.*

26. AS 16.05.258(c) (as amended in 1992). This section provides in relevant part:

In determining whether dependence upon subsistence is a principal characteristic of the economy, culture, and way of life of an area or community under this subsection, the boards shall jointly consider the relative importance of subsistence in the context of the totality of the following socio-economic characteristics of the area or community:
(1) the social and economic structure;
(2) the stability of the economy;
(3) the extent and the kinds of employment for wages, including full-time, part-time, temporary, and seasonal employment;
(4) the amount and distribution of cash income among those domiciled in the area or community;
(5) the cost and availability of goods and services to those domiciled in the area or community;
(6) the variety of fish and game species used by those domiciled in the area or community;
(7) the seasonal cycle of economic activity;
(8) the percentage of those domiciled in the area or community participating in hunting

and fishing activities or using wild fish and game;
(9) the harvest levels of fish and game by those domiciled in the area or community;
(10) the cultural, social, and economic values associated with the taking and use of fish and game;
(11) the geographic locations where those domiciled in the area or community hunt and fish;
(12) the extent of sharing and exchange of fish and game by those domiciled in the area or community;
(13) additional similar factors the boards establish by regulation to be relevant to their determinations under this subsection.

27. *See* 1992 Informal Op. Att'y Gen. 77. This court exercises its independent judgment on matters of statutory interpretation. However, the court may properly consider the opinions of the Attorney General for guidance. *See Grimes v. Kinney Shoe Corp.*, 938 P.2d 997, 1000 n. 7 (Alaska 1997); *Carney v. State Bd. of Fisheries*, 785 P.2d 544, 548 (Alaska 1990) (stating that opinions of attorney general, while not controlling on matters of statutory interpretation, are entitled to some deference).

28. *See* AS 16.05.258(b)(2) (as amended).

noted that "[a]reas ... should be large enough to include both where a particular stock or population is normally taken and where it is normally used ... the boundaries of areas should not pose a barrier to village residents who traditionally travel to a fish camp some distance from the village."[29] The Board must have the discretion to draw boundaries that are appropriate for a given set of circumstances. Given that the Board could reasonably draw the subsistence boundaries in various places, we find that the Board's decision, based on practical considerations and administrative expertise, reflects a reasoned choice.

### 2. *"Salmon" versus "chum salmon"*

The subsistence law requires the Board to identify "fish stocks ... or portions of stocks or populations, that are customarily and traditionally taken or used for subsistence."[30] The legislature defined "fish stock" as "a species, subspecies, geographic grouping or other category of fish manageable as a unit."[31] Under this definition, manageability is the key element in the classification of a category of fish as a "stock." In applying the subsistence law in Norton Sound, the Board identified the subsistence resource as simply "salmon."[32] Elim argues that the subsistence law requires the Board to separate chum salmon from other types of salmon because chum salmon are "manageable as a unit" in Norton Sound.

We give the Board's identification of fish stocks under the subsistence law considerable deference for two reasons. First, identifying a "fish stock" requires fisheries knowledge and experience and thus falls within the Board's expertise. Second, the subsistence

law defines "fish stocks" broadly, allowing the Board to identify any category of fish "manageable as a unit" as a "stock."[33] This broad definition provides the Board with the flexibility it needs to accommodate the biological and ecological concerns that accompany multi-species fisheries management. This flexibility is even more important where, as here, management issues are clouded by scientific uncertainty.

Of course, the Board's discretion is not unlimited. The Board's ultimate decisions must be reasonably related to the purposes of the subsistence law; in other words, the Board may not manipulate the identification of a "stock"—whether because that "stock" is not "manageable as a unit" or otherwise—simply to achieve a predetermined outcome. While the Board may and should weigh a variety of factors in making stock identifications—including practical factors such as administrative resources as well as scientific, cultural, economic, and ecological variables—the Board's primary goal is to ensure that "subsistence uses of Alaska's fish and game resources are given the highest preference, in order to accommodate and perpetuate those uses."[34]

As a general rule, the Board should analyze individual fish stocks for "customary and traditional" subsistence use.[35] In some circumstances, however, it may be appropriate for the Board to group stocks together in applying the subsistence preference. We review the record to determine whether the Board's decision to group stocks together here was based on careful consideration of relevant facts, and thus is reasonable.

29. 1990 Informal Op. Att'y Gen. 149.

30. AS 16.05.258(a).

31. AS 16.05.940(16); *see also* AS 16.05.258(a).

32. *See* 5 AAC 01.186.

33. AS 16.05.940(16); *see also* AS 16.05.258(a).

34. Ch. 1, § 1(c)(1), 2d Special Sess. Laws 1992.

35. *See* 1990 Informal Op. Att'y Gen. 149 ("It is evident that customary and traditional uses are

to be evaluated on particular fish stocks and particular game populations; substitution of stocks by the board is not permissible.... [E]ach stock or population is to be evaluated on its own merits to determine whether it is subject to customary and traditional uses."); *see also Bobby v. State,* 718 F.Supp. 764, 776–81 (D.Alaska 1989) (explaining that 1986 subsistence law was intended to comply with the federal Alaska National Interest Lands Conservation Act, and that the federal legislative history evidenced a similar approach; "[n]eed is not the standard.... [I]t matters not that other food sources may be available at any given time or place.").

Here, the Board determined that it was appropriate to group salmon stocks together because subsistence users themselves "customarily and traditionally" take the species interchangeably. In discussing the standard for salmon in Norton Sound, Board member Lyons noted that the all-salmon approach "acknowledges that [Norton Sound] subsistence users will and do harvest whatever is available to them to meet their needs." Lyons and Board Member Edfelt both commented that this interchangeability for subsistence purposes results from fluctuating salmon cycles in which different species "boom and bust on odd and even year cycles." Further, area biologist Lean confirmed that subsistence users "just call them big fish and little fish." Board member Angasan agreed that the Board should consider the species together because "you know you don't have pinks in the area there on an uneven year, and you still [have the same range of subsistence use]." The record thus confirms that the Board's decision to consolidate was reasonably based on evidence that the subsistence users themselves interchange salmon stocks.

Moreover, we note that the Board did consider a chum salmon component, albeit informally. In 1992 and in 1994 the Board commented on the specific escapement counts for chum salmon in Norton Sound. And in a 1996 meeting held to comply with the superior court's first summary judgment order, the Board recalculated the number of salmon needed to provide Norton Sound residents with a reasonable subsistence‑ opportunity. In these calculations the Board separated chum salmon out as a separate stock per the court's order. Although the Board did not formalize this separation in a regulation, the record contains nothing to indicate that the Board will not continue to consider chum salmon as a separate stock when circumstances require.

3. *The geographical reach of the subsistence regulation.*

■ Elim and the Board disagree with respect to the geographical reach of the subsistence preference. Elim argues that, regardless of whether a stock is "manageable as a unit" throughout its migratory range, the Board must apply the subsistence preference throughout a stock's migratory range once that stock is identified as a subsistence resource within a given area or community. In contrast, the Board argues that application of the subsistence statute to a fish stock in a specific area or community can never require that stock to be regulated in a distant, mixed stock fishery. We disagree with both of these positions.

Here, the Board identified salmon generally as a species whose use was to be regulated for purposes of subsistence in the communities of Norton Sound. It later informally acknowledged chum salmon as a separately identifiable fish stock. The Board's authority to manage that resource extended beyond the precise area of identified subsistence use, but only so long as it continued to believe that the species was "manageable as a unit" outside Norton Sound.

■ In the present case, the Board had two independent bases to justify its conclusion that in the context of the False Pass fishery, chum salmon were not manageable as a unit for purposes of subsistence use in the Norton Sound area: first, the lack of scientific certainty that False Pass chum runs actually migrate to Norton Sound; second, the impossibility of managing chums as a unit in False Pass, where their migration is mixed in with a strong, primary migration of sockeye salmon.

According to the record, neither Elim nor any scientific study has proven that the False Pass fishery in fact consumptively uses Norton Sound subsistence stocks. Elim itself acknowledges that there is a "paucity" of knowledge regarding the relationship between the False Pass fishery and Norton Sound returns. The Board, which has fisheries expertise, thus has discretion to analyze and weigh available scientific information. It commissioned studies, reviewed others, heard testimony from various experts, and decided that the available information was inconclusive. In the absence of proof that the Board's judgment is arbitrary or capricious, we decline to second-guess its conclusions regarding the scientific data.

Based on this scientific uncertainty and the difficulty inherent in managing single stocks within a mixed fishery, the Board reasonably concluded that, for purposes of the Norton Sound subsistence fishery, chums were not manageable as a unit in False Pass. The Board thus justifiably decided to manage the False Pass chums under its mixed stock policy. As long as the mixed stock policy itself is valid, the Board's choice was reasonable.

## C. The Mixed Stock Policy Is Valid.

The Board had previously adopted a mixed stock policy that this court invalidated because the Board failed to follow the requirements of the Administrative Procedure Act in adopting the policy as a regulation.[36] Consequently, in 1992 the Alaska legislature adopted AS 16.05.251(h), which required the Board to "adopt by regulation a policy for the management of mixed stock fisheries . . . . consistent with sustained yield of wild fish stocks."[37] In response, the Board adopted the mixed stock policy at issue here, 5 AAC 39.220. That regulation requires that "conservation of wild salmon stocks consistent with sustained yield shall be accorded the highest priority," and that "[a]llocation of salmon resources will be consistent with the subsistence preference in AS 16.05.258, and the allocation criteria set out [in the Board's regulations]."[38] The regulation also expresses the Board's preference for assigning conservation burdens in mixed stock fisheries through the application of specific fisheries management plans set out in regulations. In the absence of a regulatory management plan, and when it is necessary to restrict fisheries where there are known conservation problems, the regulation provides for the burden of conservation to be shared among all fisheries in proportion to the fisheries' respective harvests on the declining salmon stocks. The regulation also restricts new or expanding mixed stock fisheries in many circumstances.

Elim argues that the regulation is devoid of substance, and expresses unenforceable "preferences" rather than true management "principles." Elim also criticizes the regulation because it is not worded in definite, certain terms, but instead allows the Board discretion to address a variety of individual circumstances. Elim argues that in mandating the Board to adopt the policy "by regulation," the legislature envisioned a policy that would bind the Board in all circumstances. PMA and the Board, on the other hand, argue that the Board has appropriately retained the discretion to distribute conservation burdens disproportionately in any given management plan.

As noted, this court invalidated the Board's previous mixed stock policy due to the Board's failure to follow required administrative procedures.[39] It was this deficiency

---

36. See Gilbert v. State, Dep't of Fish & Game, Bd. of Fisheries, 803 P.2d 391, 395–97 (Alaska 1990); see also AS 44.62 (Alaska's Administrative Procedure Act).

37. See Ch. 93, § 1, SLA 1992.

38. 5 AAC 39.220 provides in part:
    (a) In applying this statewide mixed stock salmon policy for all users, conservation of wild salmon stocks consistent with sustained yield shall be accorded the highest priority. Allocation of salmon resources under this policy will be consistent with the subsistence preference in AS 16.05.258, and the allocation criteria set out in 5 AAC 39.205, 5 AAC 75.017, and 5 AAC 77.007.
    (b) In the absence of a regulatory management plan that otherwise allocates or restricts harvest, and when it is necessary to restrict fisheries on stocks where there are known conservation problems, the burden of conservation shall be shared among all fisheries in close proportion to their respective harvest on the stock of

concern. The board recognized that precise sharing of conservation among fisheries is dependent on the amount of stock-specific information available.
    (c) The board's preference in assigning conservation burdens in mixed stock fisheries is through the application of specific fishery management plans set out in the regulations. A management plan incorporates conservation burden and allocation of harvest opportunity.
    (d) Most wild Alaska salmon stocks are fully allocated to fisheries capable of harvesting available surpluses. Consequently, the board will restrict new or expanding mixed stock fisheries unless otherwise provided for by management plans or by application of the board's allocation criteria. Natural fluctuations in the abundance of stocks harvested in a fishery will not be the single factor that identifies a fishery as expanding or new.

39. See Gilbert, 803 P.2d at 395–97.

that the Alaska legislature addressed when it required the Board to adopt "by regulation" a mixed stock policy. In fact, the legislature rejected a bill that would have spelled out a substantive policy.[40] PMA and the Board argue that by rejecting a comprehensive bill for a more general one, the legislature intended to leave the Board with broad discretion in formulating a mixed-stock regulation. We agree.

The development of a mixed stock policy involves the Board's expertise, and therefore the court reviews the regulation for a reasonable basis.[41] Moreover, as the Board notes, a regulation adopted under Alaska's administrative procedure statute, AS 44.62.100, is presumed to be valid, and a challenger has the burden to demonstrate that the regulation is invalid. Elim has not met this burden. Elim insists that this regulation should have a different substance, but we may not overturn a regulation simply because one group of resource users believes that a different standard is more desirable. The mixed stock regulation is the product of a four-day meeting in which the Board took a hard look at the issues and justified its decisions through written findings. The regulation is not so indefinite and uncertain that we may overturn it as facially vague or devoid of substance. If the management principles that the regulation articulates do not satisfy the legislature, then it certainly may address those shortcomings. But for purposes of our judicial review, the regulation is a valid exercise of the Board's discretion.

## III. *CONCLUSION*

We AFFIRM the grant of summary judgment for the Board on all grounds.

CARPENETI, Justice, not participating.

**40.** *See* House Bill (H.B.) 541, 17th Leg., 2d Sess. (Feb. 18, 1992). .

**41.** *See Storrs v. State Med. Bd.*, 664 P.2d 547, 552 (Alaska 1983).