**KOYUKUK RIVER BASIN MOOSE CO-MANAGEMENT TEAM, Appellant,**

v.

**BOARD OF GAME, Frank Rue, in his official capacity as Commissioner of Alaska Department of Fish and Game, and State of Alaska, Appellees.**

No. S–10513.

Supreme Court of Alaska.

Aug. 22, 2003.

---

Michael J. Walleri, Law Offices of Michael J. Walleri, Fairbanks, for Appellant.

Kevin M. Saxby, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellees.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

We consider here whether the Alaska Board of Game violated either the sustained yield principle of article VIII, section 4 of the

Alaska Constitution or Alaska's subsistence statutes in managing moose hunting in part of the Koyukuk River Basin. We affirm the superior court decision holding that there was no violation. The Board of Game was within its discretion in adopting a regulation that allowed for the issuance of "up to" 400 permits in a controlled use area that was part of two larger Game Management Units.

## II. FACTS AND PROCEEDINGS

This appeal concerns the validity of moose hunting regulations for an area encompassing the Koyukuk Controlled Use Area (KCUA). The KCUA is located in the lower portion of the Koyukuk River drainage, and was established in 1979 to reduce the participation of non-local hunters by prohibiting the use of aircraft. The Koyukuk River flows through Game Management Units (GMU) 21D and 24. Approximately one half of the KCUA lies within the northern portion of GMU 21D, while the other half lies within the southern portion of GMU 24. Together, GMU 21D and GMU 24 cover roughly 38,000 square miles. The KCUA occupies roughly 4,791 square miles—about thirteen percent of the combined areas of GMU 21D and GMU 24. Despite the controlled use area designation, the abundance and density of moose in the KCUA continued to attract increasing numbers of non-local hunters throughout the 1980s and 1990s.

The Koyukuk River Basin Moose Co–Management Team (the team) represents a coalition of native villages located along the Koyukuk River. Villages in the Koyukuk River drainage are heavily dependent on subsistence, and the team contends that the moose population in the area has declined significantly due to increased hunting pressure.

In response to the declining moose population, the Alaska Department of Fish and Game organized the Koyukuk River Moose Hunter's Working Group to advise the department on Koyukuk River moose management. The working group was a citizen-based advisory body composed primarily of representatives from various state fish and game advisory committees. The department and the working group produced a draft management plan for Koyukuk River moose in February 2000. The plan recommended reducing the total moose harvest in the lower Koyukuk River drainage—within the area of the KCUA—by reducing the anterless moose harvest and changing the general hunt in the KCUA to a drawing hunt with separate resident and non-resident drawing pools.

The Board of Game met in Fairbanks March 3–13, 2000 and considered the draft management plan. The board heard public testimony on the proposals, including comments from team members, and written and oral comments from the team's counsel.

The board ultimately adopted, with some amendments, many of the changes proposed in the draft plan. Significant among these was Proposal No. 30, which recommended changing the portion of 5 Alaska Administrative Code (AAC) 85.045 pertaining to the general moose hunt in the KCUA. The general hunt in the KCUA had been a general registration hunt, but Proposal No. 30 recommended replacing it with a permit drawing hunt.[1] The draft proposed a drawing hunt in the KCUA with an allowance for "up to" 320 resident permits and "up to" 80 non-resident permits in the combined portions of GMU 21D and GMU 24 that are within the KCUA. This proposal allowing for the issuance of "up to" 400 permits in the KCUA was adopted as part of 5 AAC 85.045[2] and is the focus of the team's appeal in this court. The subsistence registration hunt remained unlimited within the KCUA, as did the general hunt in GMU 21D outside the KCUA, and within portions of GMU 24 outside the KCUA. "Unlimited" here refers to a lack of numerical restrictions on the number of permits issued.[3] And although the non-KCUA remainder of GMU 21D was regulated uniformly under 5 AAC 85.045, the non-KCUA remainder of GMU 24

---

1. *See* Former 5 AAC 85.045 (1999) (general registration hunt in the KCUA).

2. *See* 5 AAC 85.045 (2003) (am.7/1/00) (changing the general registration hunt in the KCUA to a drawing hunt).

3. *See* 5 AAC 85.045(19), (22) (2003) (am.7/1/00).

was further subdivided so that different provisions applied to different geographical regions within that game management unit.[4]

The subsections of 5 AAC 85.045 set permit limits for a drawing hunt in the KCUA, but the board does not manage moose in the KCUA as a distinct animal population. Rather, the board made findings under Alaska's subsistence laws[5] and managed moose populations for the larger game management units.[6]

The team filed suit against the Board of Game, Commissioner Frank Rue, and the state April 12, 2000.[7] The complaint challenged the validity of 5 AAC 85.045, claiming that (1) the board made subsistence determinations using inconsistent populations; (2) the board failed to limit the moose harvest outside the KCUA; (3) the regulation allowing "up to" 400 general hunt permits in the KCUA violated the subsistence statute and sustained yield requirements of Alaska law; and (4) the board failed to consider predator harvest rates in determining intensive game management goals. The team sought declaratory and injunctive relief. The parties filed cross-motions for summary judgment, and the superior court granted summary judgment in favor of the defendants.

The team appeals the grant of summary judgment, arguing that 5 AAC 85.045 violates the principles of sustained yield management and that the board failed to make findings

required under Alaska's subsistence statutes. The team does not appeal the board's actual findings.[8] Rather, it argues that 5 AAC 85.045 exceeds the Board of Game's estimated sustained yield harvest rate.

## III. DISCUSSION

### A. Standard of Review

 We review a grant of summary judgment de novo.[9] We substitute our judgment for that of the board when interpreting the Alaska Constitution and issues of law.[10] We interpret the constitution and legal issues "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[11]

 We review the board's application of law to a particular set of facts for reasonableness.[12] Under this standard, we "merely determine whether the agency's determination is supported by the facts and is reasonably based in law."[13] We will not substitute our judgment for that of the board or alter its policy choice when the board's decision is based on its expertise.[14]

 Regulations adopted under Alaska's administrative procedure statute are presumptively valid,[15] and challengers have the burden of demonstrating that the regulation

---

**4.** *Id.*

**5.** See, for example, the findings required under AS 16.05.255(e)-(g), and AS 16.05.258.

**6.** *See, e.g.,* 5 AAC 92.108 (2003); 5 AAC 99.025 (2003).

**7.** Appellants first brought suit in *Koyukuk River Tribal Task Force on Moose Management v. Rue* (Superior Court Case No. 4FA–99–561 Ci.), alleging various violations of Alaska subsistence statutes and constitutional provisions. That case was dismissed by the superior court for failure to exhaust administrative remedies, and we recently remanded the case following an appeal on the issue of attorney's fees. *Koyukuk River Tribal Task Force on Moose Mgmt. v. Rue*, 63 P.3d 1019, 1022 (Alaska 2003).

**8.** The team's opening brief explains that the team "does not dispute the [department's] methodology, estimates of population, the amounts reasonably necessary for subsistence, nor the general hunt success ratios." The team acknowledges

that these determinations require agency expertise, and "agrees, for the purposes of this litigation, that the Court[ ] should defer to the agency expertise with regard to the determination of these factors and the methodology used by the agency to determine sustained yield."

**9.** *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

**10.** *Id.*

**11.** *Id.*

**12.** *Id.*

**13.** *Id.* (quoting *Hammer v. City of Fairbanks*, 953 P.2d 500, 504 (Alaska 1998)).

**14.** *Id.*

**15.** *See* AS 44.62.100.

is invalid.[16] We will not overturn a resource management regulation simply because one group of resource users believes that the regulation should have a different substance.[17]

## B. The Board Was Within Its Discretion in Not Managing Moose in the KCUA as a Distinct Game Population.

 The team argues that 5 AAC 85.045, the board's regulation allowing "up to" 400 permits in the KCUA, violates sustained yield principles for moose in the KCUA. The team relies on the board's population estimates and argues that actually issuing 400 permits would exceed sustained yield projections for moose in the KCUA.

The state argued below that it was within the board's discretion to delegate management authority to the department, and that the team's alleged violation was only theoretical because the regulation's language was permissive. The board viewed the 400–permit limit as a ceiling, and expected the department to issue fewer than 400 permits.

On appeal the team relies heavily on language in the superior court's memorandum decision and order which states:

> When facts are construed in favor of the Team, the authorization of 400 permits represents a harvest rate by hunters of 9.24 percent. Although nothing in the record suggests that a 9.24 percent harvest rate could be sustained at this time in the KCUA, the Board's discussion of intensive management suggests that a harvest rate as high as 10 percent could be biologically feasible using predator control and habitat manipulation.

Despite its observation regarding sustained yield in the KCUA, the superior court granted summary judgment to the state. The superior court upheld the board's regulation as a permissive delegation of authority

to the department to issue fewer than 400 permits, and noted evidence in the record supporting the proposition that a harvest rate of 9.24 percent could be sustained in the KCUA with intensive management techniques. The parties' arguments on appeal generally track the superior court's decision, and the briefs provide extensive discussion of permissible board delegations of authority to the department, and departmental discretion in implementing board regulations.

Much of this discussion overlooks this fundamental question: does the KCUA designate a relevant game population under Alaska law? The team alleges that the regulation violates sustained yield principles with respect to moose in the KCUA. It is not clear, however, that the controlled use area corresponds to a relevant game population for management purposes. If the KCUA does not designate a relevant game population, the board is not required to make findings or satisfy sustained yield requirements under Alaska's resource management laws for moose within the KCUA.[18]

This is a threshold matter because the team's challenge to 5 AAC 85.045 is predicated on the notion that the state must satisfy the sustained yield principle for moose in the KCUA. The team does not dispute the board's findings or sustained yield projections for the two GMUs that encompass the KCUA. The state correctly indicates that the team seems to accept seven percent and five percent as estimates for the maximum sustained harvest for GMU 21D and GMU 24, respectively. The team does not argue that 5 AAC 85.045 exceeds these sustained yield harvest estimates for GMU 21D or GMU 24. Consequently, if GMU 21D and GMU 24 designate the relevant moose populations for purposes of managing all the moose in those GMUs, including moose that happen to be in

---

16. *Native Vill. of Elim,* 990 P.2d at 14. *See also Interior Alaska Airboat Ass'n v. State,* 18 P.3d 686, 689 (Alaska 2001) (noting that regulations will be upheld as long as they are "consistent with and reasonably necessary to implement the statutes authorizing their adoption" (quoting *State, Bd. of Marine Pilots v. Renwick,* 936 P.2d 526, 531 (Alaska 1997))).

17. *Native Vill. of Elim,* 990 P.2d at 14.

18. *See* AS 16.05.258; *infra* notes 19–24 and accompanying text.

the KCUA, the team's arguments regarding moose in the KCUA must fail.

The superior court's thorough memorandum decision accurately described the mechanics of game management under Alaska's subsistence statute, AS 16.05.258. The board must first identify game populations customarily and traditionally taken or used for subsistence—the so-called "C & T" designation.[19] It must then determine whether a portion of a game population given a positive C & T designation under AS 16.05.258(a) can be harvested consistent with sustained yield.[20] If so, the board must then determine the amount of the harvestable portion reasonably necessary for subsistence.[21] The board then calculates the amount, if any, available for non-subsistence uses.[22] The amount of moose available for non-subsistence use is the number remaining after subtracting the number of moose necessary for subsistence use from the portion harvestable within the constraints of a sustained yield. If the harvestable portion is insufficient to provide for all uses, the subsistence statute prescribes the allocation of the harvestable portion between different user groups, giving preference to subsistence uses.[23] For these determinations, the statute defines "game population" as "a group of game animals of a single species or subgroup manageable as a unit." [24]

The board does not manage moose in the KCUA as a distinct game population. Rather, the board uses the larger GMUs and their subunits as the relevant game populations for managing Koyukuk moose.[25] The subsections of 5 AAC 85.045 use the KCUA's geographic boundaries to set permit limits, but setting permit limits within the KCUA does not equate to game management under Alaska law.

In arguing that the board failed to make required findings under AS 16.05.255 and .258, the team contends that the board was required to manage moose in the KCUA as an identifiable game population because its regulation set harvest levels for the KCUA. The team's argument is largely conclusory. The team implies that the board's population determinations were irrational and arbitrary, but it fails to substantiate this proposition. The team presumes that because the board's regulations address moose within the KCUA, the board managed moose in the KCUA as a single population. These two propositions do not necessarily follow. Use of the KCUA boundary in 5 AAC 85.045 does not mean that the board managed moose in the KCUA as an identifiable or biologically significant game population.

The team recognizes that the board has substantial discretion to identify game populations, and acknowledges that it can do so "in any rational manner" reasonably related to the purposes of the subsistence statute. But it fails to explain why the board's decision not to manage moose in the KCUA as a distinct game population was arbitrary or somehow unreasonable in light of the statute. The team gives no legal or statutory support for the proposition that a controlled use area necessarily designates a manageable game population. The team similarly fails to substantiate the proposition that the board must manage moose in the KCUA as an identifiable game population because 5 AAC 85.045 sets permit limits within the geographical boundaries of the controlled use area. The team cites the constitutional provision requiring that Alaska's resources be "maintained on the sustained yield principle," [26] but it cites no authority suggesting that this principle must be applied to animals within a controlled use area, or simply to any cognizable game population. Indeed, the latter proposition would be untenable.

---

**19.** AS 16.05.258(a).

**20.** AS 16.05.258(b).

**21.** *Id.*

**22.** *Id.*

**23.** AS 16.05.258(b)(1)-(4).

**24.** AS 16.05.940(19).

**25.** *See* 5 AAC 99.025 (2003) (C & T determinations under AS 16.05.258); 5 AAC 92.108 (2003) (intensive management findings under AS 16.05.255(e)-(g)).

**26.** Alaska Const. art. VIII, § 4.

The team has the burden of demonstrating the invalidity of 5 AAC 85.045,[27] but in this case it failed to do so. The state maintains that it is within the board's discretion to determine game management populations, and that in this case it was reasonable not to manage moose in the KCUA as a distinct game population. We agree. While the burden of demonstrating invalidity lies with the team, the state offers substantial justification for the board's choice of management populations.

■ As an initial matter, creating a controlled use area does not necessarily amount to designating a relevant animal population for management purposes. In this case, the history of the KCUA is instructive: it was created to reduce non-local hunting by prohibiting the use of aircraft—not because it reflected a biologically significant animal population. We have held that the creation and management of a controlled use area involves "matters of policy committed to the judgment of the Board," [28] and we agree with the board's position that "[r]egulations directed at reducing competition or conflict among users of a game resource in specific areas do not amount to a concession that the animals within that smaller area are 'manageable as a unit.' "

In defense of its regulations, the board maintains that the KCUA boundaries are highly artificial, and that the KCUA moose population is too small and too dense to serve as a relevant game population for management purposes. The board correctly notes that any harvest would violate sustained yield principles if the population sample were sufficiently narrow. Given inappropriately small geographic constraints, every resource harvest could approach 100 percent.

The board also defends its choice of management populations by noting that the GMUs are the traditional populations used

for game management. Moreover, the board points to distinguishing characteristics of the KCUA, other than its size, that justify targeted permit limitations in that area. The board notes the significant moose density in the KCUA, hunter crowding problems not present in adjoining areas, and the significant harvest pressure relative to the larger GMU 21D and GMU 24.[29] The board also refers us to this instructive testimony from an area biologist:

> When we went through the plan and the discussion we had talked about the harvest rates, at the very back ... of the Koyukuk moose hunters working group plan. We gave these 8%, 7.5%, and 7% harvest rates. And those applied only to the high density portion of the controlled use area where it happens to overlay with that high density area of moose population. The generalized harvest rates of 5–7% for 21D still was the out of the bounds. So, even if we did have a higher harvest rate within the controlled use area, we were still—have the sideboards of not exceeding the unit-wide harvest rates. And so, we wouldn't be exceeding that population level for the more meaningful population biologically.

This suggests both that the KCUA does not designate the meaningful biological population, and that sustained yield principles could be satisfied for the "more meaningful" moose population despite a high rate of harvest in the KCUA.

Faced with a similar question in the fisheries context, we observed in *Native Village of Elim v. State* that "manageability" was the key element in classifying management populations.[30] We held that a population determination made by the Board of Fisheries should receive "considerable deference" for two reasons: first, because the identification of populations requires knowledge and experience and thus falls within the board's ex-

---

**27.** *Native Vill. of Elim v. State*, 990 P.2d 1, 14 (Alaska 1999) ("[A] regulation adopted under Alaska's administrative procedure statute, AS 44.62.100, is presumed to be valid, and a challenger has the burden to demonstrate that the regulation is invalid."); *see also Interior Alaska Airboat Ass'n v. State*, 18 P.3d 686, 689 (Alaska 2001).

**28.** *Interior Alaska Airboat Ass'n*, 18 P.3d at 693.

**29.** The record supports the state's contention that the KCUA yields sixty-five percent of the total moose harvest from GMU 21D and GMU 24.

**30.** 990 P.2d at 10–11.

pertise, and second, because the subsistence law defines populations broadly in order to give the board the flexibility it needs to accommodate the biological and ecological concerns involved in resource management.[31] In the same case we also noted that courts are "singularly ill-equipped to make natural resource management decisions." [32] The board's discretion is not unlimited in making population determinations, but we will uphold the board's determination if it is reasonably related to the purposes of the subsistence law.[33] The board is not permitted to manipulate game populations "simply to achieve a predetermined outcome." [34]

Under this deferential standard, the Board of Game was properly within its discretion in not managing moose in the KCUA as a distinct game population. We are satisfied with the board's rationale and will not second-guess its assessment of the manageability of moose in the KCUA. Such a determination falls within the purview of agency expertise and discretion. The team failed to show that the board's population determinations were not reasonably related to the purposes of the subsistence law, or that they were somehow manipulated to achieve a predetermined outcome. Given the planning effort undertaken by the state, this case strikes us as similar to *Native Village of Elim*[35] and *Interior Alaska Airboat Association v. State,*[36] in which we held that we will not overturn a resource management regulation simply because one group of resource users believes that a different outcome is more desirable.

We decline to hold that all areas within a GMU must be regulated uniformly, or that the board's decision not to regulate GMU 21D and GMU 24 uniformly denotes the existence of multiple game populations for sustained yield analysis. And because we reject the team's position that the KCUA designates a relevant moose population for management purposes, we are unpersuaded by the team's argument that 5 AAC 85.045 violates the sustained yield requirements of the

Alaska Constitution and Alaska law with respect to moose in the KCUA.

## C. The Team's Other Arguments Regarding Sustained Yield Fail Because They Are Predicated on the Assumption that the KCUA Designates a Relevant Game Population.

In an argument similar to its sustained yield contention, the team also asserts that the board failed to make the findings for moose in the KCUA required by AS 16.05.255 (the intensive management statute) and AS 16.05.258 (the subsistence statute). As discussed above, the board was within its considerable discretion in not using the KCUA to define a relevant moose population for management purposes. It therefore was not required to make findings under the statutes for moose in the KCUA.

The team also argues that the board should have implemented intensive management techniques in the KCUA. In its memorandum decision the superior court noted that the harvest rate in the KCUA could be maintained through intensive management. The board did not implement intensive management in the KCUA, however, and the team argues that the board's regulation is arbitrary and unreasonable because the board could only avoid violating sustained yield principles for moose in the KCUA by applying intensive management techniques. The team even suggests in its reply brief that its claims "would have been mooted" if the board had adopted intensive management initiatives.

Again, though, the team's argument regarding intensive management is inherently predicated on the twin propositions that the KCUA designates a relevant moose population, and that sustained yield must be satisfied with respect to moose in the KCUA. We review the board's population determinations under the intensive management statute with the same deferential standard we apply to

31. *Id.*

32. *Id.* at 8.

33. *Id.* at 11.

34. *Id.*

35. 990 P.2d at 14.

36. 18 P.3d 686, 693 (Alaska 2001).

population determinations under the subsistence statute. Furthermore, the violation of sustained yield principles alleged here by the team relates to moose in the KCUA—not to the GMU populations that the board permissibly managed. The team's argument calling for intensive management techniques in the KCUA fails because it is aimed at preventing a violation of sustained yield requirements for a population that does not require sustained yield analysis.

Similarly, the team advances several arguments questioning whether the board can save 5 AAC 85.045 by delegating authority to the department to issue fewer than 400 permits in the KCUA. We need not reach these arguments because the team's delegation arguments assume that, absent the delegation, the regulation would violate sustained yield requirements for moose in the KCUA. The team's delegation arguments fail because the board permissibly determined that the KCUA does not identify a relevant management population. Because sustained yield analysis for moose in the KCUA is unnecessary, the regulation need not be saved by authority delegated to the department to issue fewer than 400 permits.

## IV. CONCLUSION

For these reasons we AFFIRM the superior court's grant of summary judgment in favor of the state.