Ronald T. WEST, Appellant,

v.

STATE of Alaska, BOARD OF GAME, and McKie Campbell, Commissioner, Department of Fish and Game, Alaska Wildlife Alliance, Defenders of Wildlife, Sierra Club, Tom Classen, and Friends of Animals, Appellees.

Alaska Wildlife Alliance, Defenders of Wildlife, Cross–Appellants,

v.

Ronald T. West, State of Alaska Board of Game, and McKie Campbell, Commissioner, Department of Fish and Game, Sierra Club, Tom Classen, and Friends of Animals, Cross–Appellees.

Nos. S–13184, S–13343.

Supreme Court of Alaska.

Aug. 6, 2010.

Rehearing Denied April 5, 2011.

Robert C. Erwin, Robert C. Erwin, LLC, Anchorage, and Ronald T. West, Anchorage, for Appellant and Cross–Appellee, Ronald T. West.

Michael J. Frank, Trustees for Alaska, Anchorage, and Valerie Brown, Law Office of Valerie Brown, LLC, Anchorage, for Appellees and Cross–Appellants, Defenders of Wildlife and Alaska Wildlife Alliance.

Kevin M. Saxby, Senior Assistant Attorney General, Anchorage, and Richard A. Svobodny, Acting Attorney General, Juneau, for Appellee, and Cross–Appellee, State of Alaska.

Notice of non-participation filed by Michael A. Grisham, Dorsey & Whitney LLP, Anchorage, for Appellees and Cross–Appellees, Friends of Animals, Inc. and Tom Classen.

No appearance by Appellee and Cross–Appellee, Sierra Club.

Before: CARPENETI, Chief Justice, FABE, and CHRISTEN, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Two conservation advocacy groups and Ronald T. West appeal a superior court order granting summary judgment in favor of the Alaska Board of Game ("the Board"). The court ruled that the Board's 2006 predator control plans do not violate article VIII, section 4 of the Alaska Constitution—Alaska's sustained yield clause—and the sustained yield mandate in AS 16.05.255—Alaska's intensive game management statute. Appellants contend the Board failed to consider and apply the principle of sustained yield to its management of wolves and bears affected by predator control plans the Board established in 2006. West also appeals the superior court's denial of his motion for attorney's fees. We conclude that the Board has both a constitutional and statutory duty to apply principles of sustained yield when it establishes predator control plans, but appellants did not meet their burden of demonstrating that the 2006 plans fail to comply with sustained yield principles. We also conclude that the superior court did not abuse its discretion in denying West attorney's fees because West was not a prevailing party.

## II. FACTS AND PROCEEDINGS

Controlling predator populations to increase prey populations is a practice with a long and sometimes controversial history in Alaska.[1] Following World War II, the federal government began a far-reaching predator control program that used poison baiting and aerial hunting to control wolf populations throughout Alaska. After statehood, the use of poison baiting was prohibited in Alaska but aerial wolf hunting was not. Concerns over aerial wolf hunting and the use of snares continued in the 1990s, as did the

---

1. Some anthropologists believe that, long before European contact, indigenous people in Alaska sought to reduce predator populations, particularly wolf populations, in order to increase their harvest of prey species. *See* Comm. on Mgmt. of

Wolf and Bear Populations in Alaska, National Research Council, Wolves, Bears, and Their Prey in Alaska. Biological and Social Challenges in Wildlife Management 27–28 (1997).

controversy over predator control.[2]

Alaska's constitution incorporates principles of natural resource management that serve as the foundation for the management of Alaska's wildlife. Alaska was the first state to have a constitutional article devoted to natural resources, and it is the only state to have a constitutional provision addressing the principle of sustained yield.[3] Alaska's sustained yield clause—article VIII, section 4—provides that:

> [f]ish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses.

Alaska Statute 16.05.255 is an implementing statute for Alaska's sustained yield clause. In 1994, the Alaska legislature amended AS 16.05.255 to incorporate new principles of intensive management aimed at increasing big game prey populations in areas where the Board determines human consumptive use is preferred.[4] Alaska's intensive management statute requires that the Board adopt regulations "to provide for intensive management programs to restore the abundance or productivity of identified big game prey populations as necessary to achieve human consumptive use goals."[5] The changes to AS 16.05.255 set the stage for the current dispute because the amended statute provides for "control of predation" in areas where the Board determines intensive management is required.[6]

When the legislature adopted the intensive management statute in 1994, it expressed a clear policy that "providing for high levels of harvest for human consumptive use *in accordance with the sustained yield principle* is the highest and best use of identified big game prey populations in most areas of the state."[7] In 1998 AS 16.05.255 was again amended, this time, to include an explicit requirement that intensive game management be "consistent with sustained yield," which the legislature defined as "the achievement and maintenance in perpetuity of the ability to support a high level of human harvest of game, subject to preferences among beneficial uses, on an annual or periodic basis."[8]

Until 2006, the Board's general regulatory framework for predator control of wolves and bears was found in 5 AAC 92.110 and .115;[9] specific wolf and bear control plans were set forth in 5 AAC 92.125. Prior to 2006, any regulation adopting a predator control plan, including section .125, was required to address a series of regulatory requirements set forth in sections .110 and .115. One of the regulatory requirements was that the Board consider "sound wildlife management principles *based upon sustained yield*" for all

---

2. A 1996 public initiative banned aerial and land-and-shoot wolf hunting except by state employees when a biological emergency was declared in a specific geographical area. In 1999 the legislature expanded the grounds for authorizing a wolf control program, including to increase prey populations. *See* AS 16.05.783. The following year, the legislature passed a statute that would have allowed the general public to engage in land-and-shoot wolf hunting in areas where a wolf control program was authorized, but the statute was overturned by public referendum several months later. A 2008 public initiative sought to reimpose strict limits on authorizing predator control programs, but it was defeated.

3. Gerald A. McBeath, The Alaska State Constitution: A Reference Guide 146 (1997); Bret Adams et al., *Environmental and Natural Resources Provisions in State Constitutions*, 22 J. Land Resources & Envtl L. 73, 255–263 (2002) (listing state constitutional provisions relating to the environment and natural resources).

4. AS 16.05.255(e)(1), *as enacted by* Ch. 13, § 2, SLA 1994. Before the Board adopts an intensive management program in a given area, it must first determine that reductions in the productivity of big game prey populations may result in reductions in human harvest and that an increase in productivity is feasible using intensive management. AS 16.05.255(e)(2), (3).

5. AS 16.05.255(e).

6. AS 16.05.255(k)(4), *as enacted by* Ch. 13, § 2, SLA 1994.

7. Ch. 13, § 1, SLA 1994 (emphasis added).

8. AS 16.05.255(k), *as amended by* Ch. 76, §§ 4, 5, SLA 1998.

9. 5 AAC 92.110 related to control of predation by wolves, .115 related to control of predation by bears.

predator control plans.[10]

In a separate and earlier challenge to the Board's wolf control plans, Judge Sharon Gleason issued an order dated January 17, 2006 invalidating the then-existing predator control plans on the basis that the Board "failed to adequately address the regulatory requirements of 5 AAC 92.110."[11] The Board convened an emergency meeting in response to Judge Gleason's order and adopted interim regulations establishing temporary predator control plans to replace those that had been invalidated. At the next regularly scheduled meeting, held just a few days later, the Board eliminated the internal regulatory requirements in sections .110 and .115, including the express requirement that the Board consider sustained yield principles.

The Board again considered its predator control plans during meetings it held in March and May of 2006. During these meetings, the Board heard considerable testimony from biologists from the Alaska Department of Fish and Game (ADF & G) on the proposed permanent predator control plans. It also received extensive written comments from the public regarding the proposed plans. Ultimately, the Board adopted modified versions of the interim regulations as permanent regulations, although it expanded the coverage of the plans in some areas.

Defenders of Wildlife and The Alaska Wildlife Alliance (collectively "Defenders") challenged the validity of the Board's 2006 predator control plans in a complaint filed in August 2006.[12] In the superior court, Defenders' case focused primarily on alleged violations of Alaska's Administrative Procedure Act and an array of other substantive challenges unrelated to sustained yield. De-fenders also claimed that the Board's 2006 predator control plans were invalid because the Board failed to apply principles of sustained yield to wolf and bear populations in predator control areas when it adopted its predator control plans.

Ronald T. West was allowed to intervene in March 2007. His complaint in intervention adopts all of Defenders' claims by reference and raises two additional claims. West's Count X alleges that "defendants have violated their constitutional duty to manage game populations for the benefit of all citizens" on the grounds that they "did not conduct accurate, scientific studies of prey and predator populations." West's Count XI alleges that the Board's predator control plans "are unconstitutional ... in that [they] do not manage predators for sustained yield." West's Count XI substantially over-laps with Defenders' Count VIII.[13]

The parties filed cross-motions for summary judgment and in March of 2008 the superior court issued a comprehensive written order addressing all of the parties' outstanding claims. The court dismissed the Administrative Procedure Act claims and most of the other substantive claims unrelated to sustained yield[14] but ruled that article VIII, section 4 of Alaska's Constitution applies to predators, including wolves and bears. The court concluded that the Board's 2006 predator control plans did not violate Alaska's sustained yield clause because "the management of wildlife resources may constitutionally include a selection between predator and prey populations."[15] The court did not examine whether the Board applied the statutory principle of sustained yield when it adopted its plans because it concluded that

---

**10.** 5 AAC 92.110(d)(3) (repealed 3/10/2006, Register 177); 5 AAC 92.115(c)(3) (repealed 3/10/2006, Register 177) (emphasis added).

**11.** *Friends of Animals v. State, Dep't of Fish & Game*, 3AN–03–13489 CI (Alaska Super., January 17, 2006). *Friends of Animals* did not involve the issue of sustained yield.

**12.** Sierra Club was also a plaintiff in this action below, but does not participate on appeal.

**13.** Friends of Animals, Inc. and Tom Classen separately filed suit in November 2006. Most of their claims failed to survive summary judgment, but they do not participate on appeal.

**14.** The superior court did rule that "to the extent 5 AAC 92.125 authorizes airborne or same day airborne shooting of wolves in subunits 16(A), 20(A)-(D), and 25(C), that authorization is invalid," based on the Board's failure to make the requisite findings under AS 16.05.783(a)(1).

**15.** In reaching this decision, the superior court noted that it was "making no decision concerning the actual conduct of these or any other predator control programs."

the sustained yield principle in Alaska's intensive management statute does not apply to predators.

Although the superior court agreed with West that Alaska's constitutional sustained yield clause applies to predators, it did not agree that the Board's 2006 plans violate this constitutional provision.[16] The court also denied West's claim that the Board's alleged failure to obtain accurate scientific studies of prey and predator populations violate its constitutional duty.[17] West moved for attorney's fees under Civil Rule 82 and AS 09.60.010 arguing that he prevailed as a public interest litigant on the main issue in the case because the court agreed that Alaska's sustained yield clause applies to predators. The superior court denied West's motion for fees and also denied West's and Defenders' motions for reconsideration of its summary judgment ruling.

Defenders and West appeal the superior court's decision that the Board's predator control plans do not violate Alaska's sustained yield clause. Defenders also appeal the superior court's decision that the statutory principle of sustained yield in Alaska's intensive game management statute does not apply to predators, and West appeals the superior court's denial of his motion for attorney's fees. Because West did not appeal his claim that the Board failed to conduct accurate, scientific studies of prey and predator populations, that issue is not before us on appeal.

**16.** The superior court concluded that the plans do not violate the constitutional mandate of the sustained yield clause "to the extent that the [State's existing management of the predator populations] was challenged by any Plaintiff."

**17.** West does not appeal the superior court's dismissal of this claim.

**18.** *Parson v. State, Dep't of Revenue, Alaska Hous. Fin. Corp.*, 189 P.3d 1032, 1036 (Alaska 2008).

**19.** *Id.; McCormick v. Reliance Ins. Co.*, 46 P.3d 1009, 1011 (Alaska 2002).

**20.** *Parson*, 189 P.3d at 1036.

**21.** *Id.*

## III. STANDARD OF REVIEW

We review a grant of summary judgment de novo.[18] Summary judgment is proper if there is no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law.[19] "In reviewing a summary judgment motion, we draw all reasonable inferences in favor of the nonmoving party." [20]

The interpretation of a statute or constitutional provision is a question of law to which we apply our independent judgment.[21] "We interpret the constitution and Alaska law according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters." [22]

We review an agency's application of law to a particular set of facts for reasonableness.[23] Under this standard, we "merely determine whether the agency's determination is supported by the facts and is reasonably based in law." [24] We do not substitute our judgment for that of the agency when the agency's decision is based on its expertise.[25] We presume that regulations are valid and we place the burden of proving otherwise on the challenging party.[26]

Awards of attorney's fees are reviewed for abuse of discretion.[27] Such abuse exists if the award is "arbitrary, capricious, manifestly unreasonable, or improperly motivated." [28]

**22.** *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

**23.** *Koyukuk River Basin Moose Co–Mgmt. Team v. Bd. of Game*, 76 P.3d 383, 386 (Alaska 2003) (citing *Native Vill. of Elim*, 990 P.2d at 5).

**24.** *Id.*

**25.** *Id.*

**26.** *Lakosh v. Alaska Dep't. of Envtl. Conservation*, 49 P.3d 1111, 1114 (Alaska 2002).

**27.** *Rhodes v. Erion*, 189 P.3d 1051, 1053 (Alaska 2008).

**28.** *Id.*

## IV. DISCUSSION

Defenders and West argue that the constitutional and statutory principles of sustained yield apply to predators and that the Board did not apply sustained yield when it adopted its 2006 predator control plans. The State counters that it has no constitutional or statutory duty to apply sustained yield to wolves and bears in predator control areas, but that it nonetheless did so. We first consider whether Alaska's sustained yield clause and intensive management statute require that the Board apply principles of sustained yield when it adopts predator control plans. Because we conclude that the Board is bound by both a constitutional and statutory duty to do so, we next consider whether Defenders and West have met their burden of demonstrating that the Board's 2006 predator control plans are invalid under Alaska's sustained yield clause and intensive management statute. Ultimately, we uphold the 2006 plans because Defenders and West failed to meet this burden.

### A. The Sustained Yield Clause Applies To Predator Control.

The superior court concluded that Alaska's sustained yield clause applies to predators, including bears and wolves, but that "the management of wildlife resources may constitutionally include a selection between predator and prey populations." We apply our independent judgment to questions of constitutional interpretation and interpret Alaska's constitution "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[29]

### 1. The sustained yield clause does not distinguish between predator and prey populations.

When we interpret the Alaska Constitution, "[u]nless the context suggests otherwise, words are to be given their natural, obvious[,] and ordinary meaning."[30] The text of Alaska's sustained yield clause provides that "[f]ish, forests, *wildlife*, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle."[31] According to a plain text reading of this clause, the sustained yield principle applies to all "wildlife." The natural, obvious, and ordinary meaning of the term "wildlife" suggests that the drafters of our constitution intended a broad application of the sustained yield principle encompassing all wild animals, including wolves and bears.

The definition of "sustained yield principle" provided to the constitutional delegates by the Resources Committee of the Constitutional Convention is also helpful to our inquiry:

> As to forests, timber volume, rate of growth, and acreage of timber type can be determined with some degree of accuracy. For fish, for wildlife, and for some other replenishable resources such as huckleberries, as an example, it is difficult or even impossible to measure accurately the factors by which a calculated sustained yield could be determined. Yet the term "sustained yield principle" is used in connection with management of such resources. When so used it denotes conscious application insofar as practicable of principles of management intended to sustain the yield of the resource being managed. That broad meaning is the meaning of the term as used in the Article.[32]

This explanation explicitly states that the term "sustained yield" as used in Alaska's constitution has a "broad meaning." In addition, the statement that the sustained yield principle is used in connection with the management of fish, wildlife—and even huckleberries—suggests a broad application of this principle.

29. *Parson v. State, Dep't. of Revenue, Alaska Hous. Fin. Corp.*, 189 P.3d 1032, 1036 (Alaska 2008); *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999).

30. *Hammond v. Hoffbeck*, 627 P.2d 1052, 1056 n. 7 (Alaska 1981).

31. Alaska Const. art. VIII, § 4 (emphasis added).

32. Resources Committee, Alaska Constitutional Convention, Terms (1955).

After the drafters of Alaska's constitution finished their work, the constitution was ratified by the voters. We have stated that "in construing provisions of the Alaska Constitution, [ ] the court must look to the meaning that the voters would have placed on its provisions."[33] "[A]bsent some signs that [a] term has acquired a peculiar meaning by statutory definition or judicial construction, we defer to the meaning the people themselves probably placed on the provision."[34] Our inquiry here is aided by the "Report to the People of Alaska" prepared by the Alaska Constitutional Convention delegates in the period leading up to the ratification vote. This report informed the voters that:

> The [natural resources] article's primary purpose is to balance maximum use of natural resources with their continued availability to future generations. In keeping with that purpose, all replenishable resources are to be administered, insofar as practicable, on the sustained yield principle. This includes fish, forests, wildlife and grasslands, among others.[35]

The description in the Report to the People of Alaska, like the plain meaning of the sustained yield clause itself, does not suggest any distinction between predator and prey for purposes of applying sustained yield.

We find nothing in the plain language of the sustained yield clause suggesting that a distinction should be drawn between predator and prey populations for purposes of applying the sustained yield principle, and there is no such distinction in the descriptions of "sustained yield" supplied by the delegates who drafted the constitu-tion or to the voters who ratified it.[36] We have acknowledged that "the framers of Alaska's constitution intended the sustained yield clause to play a meaningful role in resource management,"[37] and we hold today that the sustained yield clause in Alaska's constitution applies to both predator and prey populations, including populations of wolves and bears.

## 2. The sustained yield clause permits the State to establish preferences among beneficial uses.

Having held that the sustained yield clause applies to predator populations, we must also consider whether the sustained yield clause permits the Board to give preference to populations of moose and caribou over populations of wolves and bears through the use of intensive management practices.

The starting point of this analysis is again the text of the sustained yield clause itself, which provides "wildlife ... shall be utilized, developed, and maintained on the sustained yield principle, *subject to preferences among beneficial uses.*"[38] The qualifier that makes sustained yield "subject to preferences among beneficial uses" suggests that the legislature and the Board have some discretion to establish management priorities for Alaska's wildlife. Such a construction is consistent with the constitutional history of the sustained yield clause. As we noted in *Native Village of Elim v. State,* "the primary emphasis of the framers' discussions and the glossary's definition of sustained yield is on the flexibility of the sustained yield requirement and its status as a guiding principle rather than a concrete, predefined pro-

33. *Div. of Elections v. Johnstone,* 669 P.2d 537, 539 (Alaska 1983) (internal citations and quotations omitted).

34. *Hickel v. Halford,* 872 P.2d 171, 177 (Alaska 1994).

35. THE ALASKA CONSTITUTIONAL CONVENTION, PROPOSED CONSTITUTION FOR THE STATE OF ALASKA. A REPORT TO THE PEOPLE OF ALASKA (1956).

36. The State does not contest the plain meaning of the sustained yield clause, and instead highlights the statement of Delegate Burke Riley, Secretary of the Constitutional Convention's Resources Committee, that "predators would not be maintained on a sustained yield basis." 4 Pro-ceedings of the Alaska Constitutional Convention 2451 (January 17, 1956). But "individual comments from delegates do not necessarily indicate constitutional intent," *Glover v. State, Dep't. of Transp.,* 175 P.3d 1240, 1248 (Alaska 2008), and we conclude that the text of the sustained yield clause itself, along with the descriptions provided to the voters and the delegates, contradicts the view presented by Secretary Riley.

37. *Native Vill. of Elim v. State,* 990 P.2d 1, 7 (Alaska 1999).

38. Alaska Const. art. VIII, § 4 (emphasis added).

cess."[39] This is reflected in the Report to the People of Alaska distributed before ratification of Alaska's constitution, which explains that "all replenishable resources are to be administered, *insofar as practicable,* on the sustained yield principle."[40] The glossary definition of "sustained yield" provided by the Resources Committee of the Constitutional Convention contains similar language: "[the term sustained yield principle] denotes conscious application *insofar as practicable* of principles of management intended to sustain the yield of the resource being managed."[41]

■ Based upon the text and constitutional history of the sustained yield clause, the State argues that "it allows for some uses, and therefore some resources, to be preferred over others." And Defenders recognize that "[w]hile [the sustained yield clause] requires that all wildlife, including predators, be managed for sustained yield, that does not mean the sustained yield principle precludes 'predator control' in appropriate circumstances." We agree with both these statements and affirm the superior court's ruling "that the management of wildlife resources may constitutionally include a selection between predator and prey populations."

### B. The Statutory Principle Of Sustained Yield In Alaska's Intensive Management Statute Applies To The Board's Management Of Predator Populations.

Consistent with the State's position, the superior court found it "unambiguous" that the sustained yield principle in Alaska's intensive management statute—AS 16.05.255—

applies only within the context of the Board's management of moose and caribou populations and is inapplicable to the Board's management of predator populations. Defenders counter that the statutory principle of sustained yield, like the constitutional principle, does not distinguish between predator and prey populations. "The interpretation of a statute is a question of law to which we apply our independent judgment"; we interpret statutes "according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[42]

Alaska's intensive management statute states that "[t]he Board of Game shall adopt regulations to provide for *intensive management* programs to restore the abundance or productivity of identified big game prey populations as necessary to achieve human consumptive use goals of the board."[43] The statute also provides definitions for key terms. "Intensive management" is defined as "management of an identified big game prey population consistent with *sustained yield* through active management measures to enhance, extend, and develop the population to maintain high levels or provide for higher levels of human harvest, including control of predation."[44] "Sustained yield" is defined by the statute as "the achievement and maintenance in perpetuity of the ability to support a high level of human harvest of game, subject to preferences among beneficial uses, on an annual or periodic basis."[45]

Substituting the meaning of the defined terms into subsection (e) of the statute produces the following legislative mandate for intensive management:

**39.** 990 P.2d at 7–8.

**40.** THE ALASKA CONSTITUTIONAL CONVENTION, PROPOSED CONSTITUTION FOR THE STATE OF ALASKA: A REPORT TO THE PEOPLE OF ALASKA (1956) (emphasis added).

**41.** Resources Committee, Alaska Constitutional Convention, Terms (1955) (emphasis added).

**42.** *Parson v. State, Dep't. of Revenue, Alaska Hous. Fin. Corp.,* 189 P.3d 1032, 1036 (Alaska 2008).

**43.** AS 16.05.255(e) (emphasis added). The superior court focused its analysis on subsection (g) of the statute, which requires that the Board

establish population and harvest goals and seasons for intensive management, rather than subsection (e) of the statute, which establishes the framework under which the Board shall adopt regulations to establish intensive management programs.

**44.** AS 16.05.255(k)(4) (emphasis added).

**45.** AS 16.05.255(k)(5) (emphasis added). The superior court's order incorrectly states that the term "sustained yield" is not defined.

The Board of Game shall adopt regulations to provide for [management of an identified big game prey population consistent with [the achievement and maintenance in perpetuity of the ability to support a high level of human harvest of *game*, subject to preferences among beneficial uses]] to restore the abundance or productivity of identified big game prey populations as necessary to achieve human consumptive use goals of the board.[46]

From this language it follows that whether or not the statutory principle of sustained yield distinguishes between predator and prey populations depends on the meaning of the word "game." Alaska Statute 16.05.940(19) defines "game" as "any species of bird, reptile, and mammal," [47] suggesting that intensive management must be consistent with a principle of sustained yield which encompasses all animals, including both predator and prey populations.

The State does not provide an alternative construction based upon the statute's language, but argues that Defenders' construction "turns [the] intensive management law into a nonsensical, unworkable mess" by applying the sustained yield principle to predators. According to the State, application of sustained yield to predators requires that the State simultaneously maximize the populations of predators and their prey. We disagree. The language of this implementing legislation does not result in the absurd results the State warns against because the statutory principle of sustained yield, like its constitutional counterpart, contains the qualifier that sustained yield is "subject to preferences among beneficial uses." [48]

[■] Based upon the text of Alaska's intensive management statute, as well as the principle that a statutory construction that is consistent with constitutional principles is preferred over one that is inconsistent,[49] we hold that the principle of sustained yield set forth in Alaska's intensive management statute applies to predator populations but that the management of wildlife resources may include a selection between predator and prey populations.

## C. Defenders And West Failed To Meet Their Burden To Prove That The Board's 2006 Predator Control Plans Violate Principles Of Sustained Yield.

[■] Having held that both the constitutional and statutory principles of sustained yield apply to wolf and bear populations, we now consider the contention that the Board failed to apply principles of sustained yield to its 2006 predator control plans. The superior court ruled that "to the extent that [the State's existing management of the predator populations] was challenged by any Plaintiff" it does "not violate th[e] constitutional mandate" of Alaska's sustained yield clause. The court did not reach the question of whether the Board's 2006 plans are consistent with the statutory principle of sustained yield because it determined the statutory mandate did not apply to predators.[50] Appellant and cross-appellants had the burden of demonstrating the invalidity of the Board's 2006 predator control plans.[51] To survive summary judgment, they were required to establish that a genuine issue of material fact was in dispute.[52]

**46.** AS 16.05.255(e), (k)(4), (k)(5) (emphasis added).

**47.** This definition applies to AS 16.05–16.40, including AS 16.05.255.

**48.** AS 16.05.255(k)(5).

**49.** *Alaskans for a Common Language, Inc. v. Kritz,* 170 P.3d 183, 192 (Alaska 2007) ("[C]ourts should if possible construe statutes so as to avoid the danger of unconstitutionality.") (internal citations and quotations omitted).

**50.** The question of whether the Board adopted its predator control plans consistent with the statu-tory principle of sustained yield was argued by the parties below, and neither party suggests that the constitutional and statutory principles of sustained yield demand separate analyses. We therefore examine this question ourselves rather than remanding for further proceedings.

**51.** *Koyukuk River Basin Moose Co–Mgmt. Team v. Bd. of Game,* 76 P.3d 383, 389 n. 27 (Alaska 2003).

**52.** *McCormick v. Reliance Ins. Co.,* 46 P.3d 1009, 1011 (Alaska 2002).

Defenders acknowledge that the sustained yield principle does not preclude predator control in appropriate circumstances, but Defenders contend that the Board did not consider or apply the sustained yield principle to wolves and bears when it adopted its 2006 predator control plans.[53] Defenders argue that we should decline to infer that the Board applied sustained yield when there is no mention or discussion of applying sustained yield to wolf and bear populations in either the Board's predator control plans or in the administrative record. Defenders also argue that the Board's repeal of the express sustained yield requirements in 5 AAC 92.110 and .115 along with the statement in its bear management policy that "[g]enerally, bear hunting will be conducted on a sustained yield basis, except in areas where a bear predation control program is authorized"[54] demonstrates that the Board chose *not* to apply sustained yield to wolf and bear populations.

The State argues the Board was not required to apply sustained yield to wolf and bear populations in its predator control plans. Nonetheless, the State maintains that the Board's plans and the supporting administrative record illustrate the conscious application of sustained yield principles, although that term is not used explicitly.

In considering whether the Board actually applied principles of sustained yield when it adopted its 2006 predator control plans, we first examine the language of the plans themselves and observe that the plans do not expressly mention the sustained yield mandate. But the regulation adopting the 2006 plans—5 AAC 92.125—sets management objectives for the wolf and bear populations in each predator control area, establishes procedures for tracking when predator populations are in danger of falling below the management objectives, and requires that the Board suspend predator control activities and close hunting and trapping seasons when necessary to ensure that minimum population objectives are met.[55] The regulation also sets specific geographic boundaries for predator control areas[56] and includes sunset provisions establishing expiration dates for the Board's authority to engage in predator control.[57]

The regulations also contain numerous statements relating to the continuation and maintenance of wolf and bear populations within predator control areas. For example, the regulations state "it is the intent of this plan to maintain wolves as part of the natural ecosystem within the geographical area described for this plan."[58] In balancing the goal of "substantially reduc[ing] wolf numbers compared to the pre-control level in order to relieve predation pressure on moose and allow for improved recruitment to the moose population" with the goal of "main-

---

**53.** We focus on Defenders' arguments here because, on appeal, West primarily focuses his argument on the propriety of the superior court even addressing the issue of whether the Board's plans were adopted in accordance with the sustained yield clause. To the extent the superior court addressed this issue, we conclude that it acted properly.

**54.** Board of Game Bear Conservation and Management Policy, Findings of the Alaska Board of Game 2004–147–BOG, at 4 (March 8, 2004).

**55.** For example, 5 AAC 92.125(c)(6) provides that with respect to the predator control area in Game Management Unit (GMU) 13, "the commissioner will suspend wolf control activities when (i) wolf inventories or accumulated information from permittees indicate the need to avoid reducing wolf numbers below the management objective of 135 wolves specified in this subsection." It also provides that "the commissioner will annually close wolf hunting and trap-

ping seasons, as appropriate to ensure that the minimum wolf population objective is met." This regulation is based upon testimony presented by the field biologists covering the GMUs for each of the predator control areas, as well as the Board's prior findings authorizing predator control in these areas.

**56.** For example, 5 AAC 92.125(c) sets forth the geographic boundaries of the predator control area for GMU 13.

**57.** For example, 5 AAC 92.125(c)(6)(B)(ii) provides that "wolf control activities will be terminated ... (ii) upon expiration of the period during which the commissioner is authorized to reduce predator numbers in the predator control plan area." For GMU 13, for example, the commissioner is authorized to engage in predator control efforts "for up to five years...." 5 AAC 92.125(c)(5)(A).

**58.** 5 AAC 92.125(c)(1)(C)(i).

tain[ing] wolves as part of the natural ecosystem" within the predator control area, the regulation sets a minimum wolf population objective for each plan in order to "ensure that wolves persist within the plan area." [59] The predator control regulation also states that "if wolf predation control efforts continue and the wolf population is reduced according to the wolf population and harvest objectives, the wolf population will be maintained at [the control population objective] for several years, but once the moose population increases and wolf control efforts are discontinued, the wolf population will increase in response to the increased prey base." [60] Even where the regulation sets an objective of reducing black and brown bear populations to "the lowest level possible" within the bear control area in GMU 19(D)-East, the regulation states that "because the [bear control area] is a relatively small geographic area, removing black [and brown] bears from within it will have only a minor effect on the black [and brown] bear population[s] in Unit 19(D)-East overall." [61]

The predator control regulation also provides for continued harvest of wolves and bears for human consumption as an integral component of the predator control plans, setting "annual harvest objective[s]" [62] for wolves and bears in the predator control areas and acknowledging that "some hunters and trappers will continue to pursue wolves . . . regardless of same-day-airborne wolf control efforts." [63]

We also find it significant that while the Board eliminated the regulatory requirements set forth in sections .110 and .115—including the express requirement that it consider sustained yield—it appears that the Board nonetheless adopted its 2006 predator control plans to be consistent with these requirements. The subsection headings in the Board's predator control plans closely mirror the requirements of subsections .110(b) and .115(b), and the content of the predator control plans reflects the substantive requirements of subsections .110(d) and .115(c).[64]

A review of the administrative record demonstrates that the Board considered a great deal of information about how the long-term viability and sustainability of wolf and bear populations would be impacted by predator control efforts. Most significantly with respect to wolf control, the Board heard testimony from ADF & G biologists that wolf populations would recover to, or even exceed, pre-control levels within three to five years after wolf control ends.[65] And while testimony relating to bears suggested that bear recovery would take longer given the lower reproductive and immigration rates of bears, ADF & G biologists did not suggest that the long-term viability or sustainability of bear populations would be put at risk by the 2006 bear control plans.

Based on our review of the record, we are unpersuaded by Defenders' argument that the Board failed to apply sustained yield altogether. Failing to show that the Board

**59.** 5 AAC 92.125(c)(2)(B).

**60.** 5 AAC 92.125(e)(1)(C)(vi).

**61.** 5 AAC 92.125(f)(3)(E) and (F).

**62.** 5 AAC 92.125(c)(1)(C)(ix).

**63.** 5 AAC 92.125(c)(1)(D)(iii).

**64.** It appears the reason the Board's predator control plans reflect the requirements of 5 AAC 92.110 and .115, even though these requirements were later repealed, is that the permanent regulation was based largely upon the interim regulation adopted when the requirements were still in effect. Judge Gleason issued her ruling that the Board's previous predator control plans were invalid because they failed to address the re-

quirements of .110 on January 17, 2006. The Board adopted its interim regulation during an emergency teleconference meeting on January 25, 2006. The Board did not repeal .110(b) and (d) and .115(b) and (c) until the Board's regularly scheduled meeting on January 29, 2006.

**65.** ADF & G Wildlife Research Biologist Mark McNay gave a lengthy presentation to the Board during its March 12, 2006 meeting on this topic, and he reported that in studies reviewed by the National Research Council, "wolf populations rebounded to 88 to 112 percent of the precontrolled population size in three to five years." He also highlighted that the National Research Council concluded that "[n]o available data suggests that the killing of wolves by humans has adversely affected the long-term social organization, reproductive rates, or population dynamics of the species."

did not apply sustained yield at all, Defenders' burden was to show that the Board's application of sustained yield to predator populations lacked a reasonable basis, was arbitrary or capricious, or failed to consider important factors [66] by showing, for example, that the Board used incorrect estimates of populations, or because harvest levels were set too high. Defenders did not contend that the Board acted arbitrarily in applying sustained yield principles to its 2006 plans; it focused entirely on its claim that the Board failed to apply the sustained yield principles at all. Defenders did express concern over whether the Board's minimum population objectives "will be large enough to permit a yield, sustained or otherwise, now or in the future" but Defenders did not elaborate or support this concern with evidence. Because the Board is entitled to deference in areas where it has special expertise, such as application of sustained yield, Defenders bore a significant burden in demonstrating that it acted in an arbitrary manner. On this record, we must conclude that Defenders failed to meet their burden, and that the superior court properly declined to vacate the 2006 predator control regulations on those grounds.

 In reaching this decision, we expressly reject the Board's position that the application of sustained yield to wolf and bear populations in predator control areas is discretionary and based only on its policy view that these "highly valued resources" should be "maintained as healthy and necessary components of our ecosystems," rather than any constitutional or statutory mandate.[67] It is the Board's constitutional and statutory duty to apply principles of sustained yield when it adopts predator control plans; this is not a policy question subject to Board discretion.

### D. The Superior Court Did Not Err In Denying West Attorney's Fees.

 West argues that the superior court erred in denying him attorney's fees as a prevailing party under Alaska Civil Rule 82 and AS 09.60.010. The superior court ruled that although West prevailed on his argument that the constitutional principle of sustained yield applies to predators, he failed on the main issue he pursued: invalidating the 2006 predator control regulations. As such, the superior court concluded that he was not a prevailing party entitled to attorney's fees. Our court reviews awards of attorney's fees for abuse of discretion.[68] Abuse of discretion exists if the award is "arbitrary, capricious, manifestly unreasonable, or improperly motivated." [69]

West did not prevail on the main issue in this litigation. His claim was that the Board's predator control regulations do not comply with Alaska's sustained yield clause.[70] He did not "successfully prosecute[ ] or defend[ ] against the action," nor was he "successful on the 'main issue' of the action" and he was not the party "in whose favor the decision or verdict [was] rendered and the judgment entered." [71] We recognize the care West took to research the constitutional question raised in this case, but the "main issue" was whether the adoption of a particular regulation passed constitutional muster;

**66.** *Trustees for Alaska v. State, Dep't of Natural Res.*, 795 P.2d 805, 809 (Alaska 1990) (stating that "determinations involv[ing] complex subject matter or fundamental policy formulations" are reviewed "only to the extent necessary to ascertain whether the decision has a reasonable basis, . . . was not arbitrary, capricious, or prompted by corruption," and did not "fail[ ] to consider an important factor in making its decision.") (internal quotations omitted).

**67.** The State further comments in its brief that despite its position "that predators need not be maintained on a sustained yield basis, the Department and Board, exercising their discretion to manage for beneficial uses of all wildlife, have always maintained that Alaska's wolf and bear populations should be managed in accordance with the sustained yield principle."

**68.** *Rhodes v. Erion*, 189 P.3d 1051, 1053 (Alaska 2008).

**69.** *Id.*

**70.** West claims that in his cross-motion for summary judgment he only argued the constitutional issue. While this may be the case, the State sought summary judgment on all of West's claims, and the superior court ruled in its favor.

**71.** *Day v. Moore*, 771 P.2d 436, 437 (Alaska 1989).

this litigation was not an untethered inquiry into constitutional meaning. The superior court correctly entered summary judgment in the State's favor on West's Count XI. We affirm the superior court's decision denying West attorney's fees.

## V. CONCLUSION

We AFFIRM the superior court's ruling regarding the applicability of Alaska's sustained yield clause to predator populations but REVERSE its ruling that AS 16.05.255 does not apply to predator populations. We AFFIRM the court's ruling that Defenders and West failed to meet their burden to show that the Board's 2006 predator control plans violate Alaska's sustained yield clause, and hold that Defenders and West also failed to show that the plans violate the sustained yield provisions of Alaska's intensive management statute. We AFFIRM the superior court's order denying West's motion for attorney's fees.

WINFREE, Justice, not participating.