*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ROBERT CASSELL, | ) | |
| | ) | Supreme Court No. S-18476 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-19-07460 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF FISH & GAME, BOARD OF | ) | No. 7764 – May 2, 2025 |
| GAME, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Matthew T. Findley and Eva R. Gardner, Ashburn & Mason, Anchorage, for Appellant. Katherine Demarest and David A. Wilkinson, Assistant Attorneys General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee. James H. Lister, David K. Gross, and Adam W. Cook, Birch Horton Bittner & Cherot, Anchorage, for Amicus Curiae Alaska Professional Hunters Association. Brent Cole, Law Office of Brent R. Cole, P.C., Anchorage, for Amicus Curiae The Hunting Coalition. Susan Orlansky, Reeves Amodio LLC, Anchorage, for Amicus Curiae Resident Hunters of Alaska.

Before: Maassen, Chief Justice, and Borghesan, Henderson, and Pate, Justices. [Carney, Justice, not participating.]

BORGHESAN, Justice.

## I.     INTRODUCTION

An Alaska hunter challenges the State's regulation allocating permits to hunt Kodiak brown bears.  The regulation allocates at least 60% of permits to Alaska residents and no more than 40% to nonresidents, who (with very limited exceptions) are required to hunt with a professional guide.[1]  The hunter argues that allocating permits to nonresidents grants them a special privilege to use wildlife resources on the basis of residency, in violation of the Alaska Constitution's principle of equal access to fish and game.[2]  He also argues that allocating permits to nonresidents hunting with professional guides violates the State's constitutional duty to manage Alaska's resources for the maximum benefit of Alaskans.[3]

We reject the equal access claim.  Making fish and game available to Alaska residents on different terms than nonresidents does not, in itself, violate the constitutional rule of equal access.  Nor has the hunter shown that the system gives nonresidents an unconstitutional special privilege to hunt Kodiak brown bears.  For the most part, nonresidents cannot apply for a permit unless they pay the steep cost of hiring a professional guide, while Alaska residents face no such barriers in applying for a permit.

We also reject the maximum benefit claim.  The State may consider the economic benefits of different uses of wildlife when deciding how to allocate Alaska's wildlife resources.  The challenged regulation reflects the State's judgment that guided

---

[1]     5 Alaska Administrative Code (AAC) 92.061(a).

[2]     *See State, Dep't of Fish & Game v. Manning*, 161 P.3d 1215, 1219-20 (Alaska 2007) (describing Alaska Const. article VIII, §§ 3, 15, and 17 as "equal access" clauses).

[3]     Alaska Const. art. VIII, §§ 1-2.

hunting by nonresidents brings conservation and economic benefits to Alaskans, and it is not our role to second-guess that judgment.

We therefore affirm the superior court's judgment against the hunter.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Kodiak Archipelago is home to around 3,500 of the largest bears in the world. The opportunity to hunt one of these majestic creatures is highly coveted. Hunting pressure and overharvesting in the 1960s led to emergency hunting closures; in 1968 the U.S. Fish & Wildlife Service, which managed bear hunting on Kodiak at the time, created a new permitting system. Because of the "first come, first served" nature of the permit system, nonresident clients of established Kodiak guides were receiving 55% of the permits and taking roughly 60% of the bears by 1975.

In 1976 the State took over management of brown bear hunting on Kodiak. The State's Board of Game, which has statutory authority to regulate hunting and conservation of Alaska's game resources,[4] established a regulation for sport hunting of brown bears in Game Management Unit (GMU) 8, which covers Kodiak and adjacent smaller islands.[5] The regulation created a lottery system under which at least 60% of permits for GMU 8 must be awarded to Alaska residents, while no more than 40% may be awarded to nonresidents.[6]

---

[4]     *See* AS 16.05.221(b); AS 16.05.255 (describing types of regulations Board of Game may adopt, including "regulating sport hunting and subsistence hunting as needed for the conservation, development, and utilization of game").

[5]     *See* 5 AAC 92.450(8) (description of GMU 8).

[6]     *See* 5 AAC 92.061(a) ("In the Unit 8 general brown bear drawing permit hunt, the department shall issue permits, and a hunter may apply for a permit, as follows: (1) the department shall issue a maximum of 40 percent of the drawing permits to nonresidents and a minimum of 60 percent to residents; each guide may submit the same number of nonresident applications for a hunt as the number of permits available

Both Alaska residents and nonresidents must apply for a drawing permit to hunt brown bears in GMU 8, but they are subject to different rules.[7] Alaska residents may apply for up to six hunts per big game species, and they may submit six applications for the same hunt (increasing their odds of winning that permit six-fold). But nonresidents applying for a brown bear permit in GMU 8 may submit only one application for the spring season and one application for the fall season. With very limited exceptions, nonresidents can apply for a permit only if they show proof that they will be accompanied by a professional hunting guide.[8] Hiring a guide to hunt brown bear in Kodiak is expensive. Evidence in the record indicates that the cost is over $20,000 per client.

Roughly half of GMU 8 is within the Kodiak National Wildlife Refuge, where the U.S. Fish & Wildlife Service has created 24 exclusive guide areas. For each area a single guide holds a special use permit granting the exclusive right to offer hunting guide services in that area. The guide permits are awarded through a competitive application process. Guides that receive special use permits must pay administrative fees and annual fees for the use of refuge lands. They must also provide annual reports and are subject to periodic performance evaluations.

---

for that hunt."). The 60/40 rule was first adopted in 1976 under 5 AAC 81.055, but this version was repealed in 1985.

[7]     Resident hunters must purchase a hunting license for $45 and a bear tag for $25. For a nonresident, a hunting license costs $160 and a bear tag costs $1,000. For a nonresident alien, a hunting license is $630 and a bear tag is $1,300.

[8]     5 AAC 92.061(a)(3). The regulation permits a nonresident who will be accompanied by an Alaska-resident relative within the second degree of kinship to apply for a permit, but these applications are included in the pool of applications for permits reserved for residents, and only four permits per year may be awarded to nonresident hunters accompanied by a resident relative. 5 AAC 92.061(a)(2).

Dr. Robert Cassell is an Alaska resident and avid hunter who has applied for a Kodiak brown bear permit several times but has never received one.[9] In April 2018 Cassell submitted a proposal to the Board of Game which would have apportioned at least 90% of the Kodiak brown bear permits to Alaska residents only, with the remaining 10% available to both residents and nonresidents.

The Board considered Cassell's proposal during its March 2019 meeting. The Alaska Department of Fish & Game (ADF&G) took a neutral position on the proposal. ADF&G presented harvest statistics for the Kodiak brown bear hunt. Based on past participation and success rates, ADF&G projected that under Cassell's proposal the overall harvest would decrease from 165 bears to 126 bears per year, but the female take would go unchanged at roughly 42 bears per year. ADF&G explained that guided hunts are generally more successful than unguided hunts, while taking a higher percentage of older male bears. The harvest of older male bears reduces the hunt's impact on the population's sustainability. ADF&G took the position that Cassell's proposal "may require us to reduce the number of permits so we don't exceed 60 percent male harvest, 40 percent female harvest target objective." The Board rejected Cassell's proposal by a vote of five to one.

### B.    Proceedings

In May 2019 Cassell sued the Board of Game, challenging the Kodiak brown bear sport hunting regulation. He sought a declaration that the State's allocation of permits to nonresidents is unconstitutional and an injunction preventing the Board from making any number of permits available exclusively to nonresidents.

Cassell moved for summary judgment. He argued that "any allocation of big game permits exclusively to nonresidents is unconstitutional on its face" under article VIII of the Alaska Constitution, which governs management of natural resources

---

[9]    Dr. Cassell asserted that he has applied for this hunt "repeatedly" and "numerous times" but did not state the precise number of times he has applied.

and requires fish and game to be managed for the benefit of all Alaskans. Cassell also argued that the Board's consideration of economic factors in establishing the permitting system did not cure the constitutional problem with allocating permits exclusively to nonresidents.

The State opposed Cassell's motion and filed a cross-motion for summary judgment. It argued that the challenged regulation does not unconstitutionally exclude anyone from hunting Kodiak brown bears because it allocates opportunities to both residents and nonresidents. The State argued that the regulation favors residents by allocating a higher percentage of permits to them, allowing them to apply for the same permit up to six times, and allowing them to seek a permit without having to hire an expensive professional guide. The State argued that the regulation balances multiple interests, including the economic benefits of guided hunting by nonresidents, while maintaining sustained yield of the brown bear population in accord with article VIII, section 4 of the constitution.[10]

The superior court upheld the regulation, agreeing with the State's arguments in a brief order. The superior court concluded that "Article VIII § 3 protects Alaska hunting guides as well as resident hunters, and the balanced allocation now in place falls well within the permissible bounds set by the regulation and Article VIII §§ 2 and 4." The court called Cassell's exclusive-grant argument "particularly facile" and "a verbal sleight of hand," reasoning that "there is not a single Kodiak brown bear hunt that excludes residents."

Cassell appeals.

## III. STANDARD OF REVIEW

---

[10] *See* Alaska Const. art. VIII, § 4 ("Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses.").

"The interpretation of a statute or constitutional provision is a question of law to which we apply our independent judgment."[11] "We interpret the constitution and Alaska law according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[12]

## IV. DISCUSSION

The delegates to Alaska's constitutional convention "sought to enshrine in the state constitution the principle that the resources of Alaska must be managed for the long-run benefit of the people as a whole."[13] The fruit of their labor, article VIII of the Alaska Constitution, establishes numerous trust-like principles governing the management of Alaska's natural resources.[14]

Two of these principles are especially relevant to this appeal. The State must manage natural resources "for the maximum benefit of its people."[15] And Alaskans must enjoy "equal access" to the State's fish and wildlife.[16] As we explain

---

[11] *West v. State, Bd. of Game*, 248 P.3d 689, 694 (Alaska 2010).

[12] *Id.* (quoting *Native Vill. of Elim v. State*, 990 P.2d 1, 5 (Alaska 1999)).

[13] *Sagoonick v. State*, 503 P.3d 777, 783 (Alaska 2022) (quoting GORDON HARRISON, ALASKA LEGISLATIVE AFFAIRS AGENCY, ALASKA'S CONSTITUTION: A CITIZEN'S GUIDE, 129-30 (5th ed. 2021), available at: http://akleg.gov/docs/pdf/citizens_guide.pdf).

[14] *See Kanuk ex rel. Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1099 (Alaska 2014).

[15] Alaska Const. art. VIII, § 2.

[16] *See State, Dep't of Fish & Game v. Manning*, 161 P.3d 1215, 1219-20 (Alaska 2007) (explaining that equal access clauses — Alaska Const. art. VIII, §§ 3, 15, 17 — prohibit granting "exclusive rights or special privileges" in fish and game and that regulations excluding some but not all Alaskans from a user group of natural resources are subject to judicial scrutiny); *McDowell v. State*, 785 P.2d 1, 9 (Alaska 1989) ("[A]ny system which closes participation to some, but not all, applicants will necessarily create a tension with article VIII."); *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 492-93 (Alaska 1988) (explaining that article VIII, § 3

---

below, Cassell fails to show that the challenged regulation, which allocates up to 40% of Kodiak brown bear permits to nonresidents hunting with professional guides, violates the principle of equal access or the principle of managing resources for maximum benefit to Alaskans.

### A. Cassell Fails To Show That Allocating A Portion Of Hunting Permits To Nonresidents Violates The Equal Access Clauses Of Article VIII Of The Alaska Constitution.

Cassell argues that the State's permitting system for hunting brown bears in GMU 8 grants an exclusive right or special privilege to nonresidents and the guiding industry, in violation of the equal access provisions of article VIII. Although Cassell cites statistics to suggest that nonresidents have a much greater chance of winning a bear permit than residents do, this alleged numerical advantage is not the basis for his argument.[17] Rather, Cassell maintains that reserving even a single brown bear permit for nonresidents amounts to an unconstitutional exclusive grant or special privilege because it reduces Alaskans' opportunity to access Alaska's resources. According to Cassell, the State cannot cure this constitutional defect by making a majority of permits available exclusively to Alaska residents.

Cassell's arguments lack support in our decisions interpreting the equal access provisions. These provisions prohibit "monopolistic grants or special privileges" to take fish and game.[18] They require scrutiny of any regulation excluding some Alaskans, but not others, from a particular use of fish and game.[19] And they

---

reveals "an anti-monopoly intent to prohibit 'exclusive grants' and 'special privilege[s]' to fish and wildlife").

[17] The statistics are not as clear-cut as Cassell suggests, a point we discuss further below.

[18] *Owsichek*, 763 P.2d at 496.

[19] *See, e.g.*, *McDowell*, 785 P.2d at 8-9; *Manning*, 161 P.3d at 1220-21.

prohibit using the location of Alaskans' residence to do so.[20] But they do not prohibit treating Alaska residents differently than nonresidents.[21] And Cassell has failed to show that reserving some hunting opportunities for nonresidents — on conditions more onerous than those applicable to Alaskans — grants nonresidents an exclusive grant or "special privilege" of the sort prohibited by article VIII.

### 1. The equal access clauses prohibit exclusive grants and special privileges to Alaska's fish and wildlife.

In creating article VIII of the Alaska Constitution, the delegates "intended to constitutionalize historic common law principles governing the sovereign's authority over management of fish, wildlife and water resources."[22] At English common law the crown held title to game resources in their natural state, but under the American system of popular sovereignty game resources are held in common by the people.[23] This principle is enshrined in article VIII, section 3 of the Constitution: "Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use."

The "common use clause" imposes on the State a duty to manage Alaska's wildlife "*as a trust for the benefit of the people*, and not as a prerogative for the

---

[20] *McDowell*, 785 P.2d at 8-9.

[21] *Shepherd v. State, Dep't of Fish & Game*, 897 P.2d 33, 43-44 (Alaska 1995) ("Resident and nonresident recreational users of Alaska fish and game are not similarly situated."); *see also Gilbert v. State, Dep't of Fish & Game, Bd. of Fisheries*, 803 P.2d 391, 399 (Alaska 1990) ("The individual interest in equal access to fish and game resources is a 'highly important interest running to each person within the state.'" (quoting *McDowell*, 785 P.2d at 10; *Owsichek*, 763 P.2d at 492 n.10)).

[22] *Owsichek*, 763 P.2d at 493; *see id.* at 493 n.11 ("The language in this section harks back to the old tradition whereby wildlife in its natural state was in the presumed ownership of the sovereign until reduced to possession." (quoting 4 Proceedings of the Alaska Constitutional Convention (PACC) 2492 (Jan. 18, 1956))).

[23] *See id.* at 493 (citing COMM. ON RES., PAPERS OF THE ALASKA CONST. CONVENTION, FOLDER 210, TERMS (1955)).

advantage of the government as distinct from the people, *or for the benefit of private individuals as distinguished from the public good*."[24] It prohibits "monopolistic grants or special privileges" to take fish and game,[25] "as was so frequently the case in ancient royal tradition."[26]

The common use clause, in conjunction with two other provisions of article VIII, also enshrines the related but distinct principle that the State should treat Alaskans uniformly when conferring rights to use Alaska's fish and game.[27] In *McDowell v. State* we acknowledged that because there is usually not enough fish and wildlife to satisfy everyone, the State "may, indeed must, make allocation decisions between sport, commercial, and subsistence users" of fish and wildlife.[28] If allocation among uses is not enough to conserve the resource, the State may exclude some Alaskans from particular uses of fish and wildlife.[29] But this kind of exclusion is subject to scrutiny: "[A]ny system which closes participation to some, but not all, applicants"

---

[24] *Id.* at 494 (emphasis in original) (quoting *Geer v. Connecticut*, 161 U.S. 519, 529 (1896)).

[25] *Id.* at 496.

[26] *See id.* at 493 (quoting COMM. ON RES., PAPERS OF THE ALASKA CONST. CONVENTION, FOLDER 210, TERMS (1955)).

[27] Alaska Const. art. VIII, § 15 (providing "no exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State" while permitting legislature to limit entry to fisheries for conservation and economic purposes); Alaska Const. art. VIII, § 17 ("Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation."); s*ee also* COMM. ON ARTICLE ON STATE LANDS AND NATURAL RESOURCES, ALASKA CONST. CONVENTION PAPERS, FOLDER 210, 3 (1956) (describing uniform application clause, enacted as § 17, as "intended to exclude any especially privileged status for any person in the use of natural resources subject to disposition by the State").

[28] 785 P.2d 1, 8-9 (Alaska 1989).

[29] *Id.* at 9 ("We do not imply that the constitution bars all methods of exclusion where exclusion is required for species protection reasons.").

must be sufficiently related to an important state interest.**30** And any limitation using residency as a criterion to "conclusively exclude[]" Alaskans from a user group is "per se impermissible."**31** For that reason, in *McDowell* we struck down a law under which only rural residents of Alaska were eligible for subsistence hunting and fishing, which had priority over commercial and sport uses in times of scarcity.**32**

By contrast, we have upheld regulations that do not "place 'limits . . . on the admission to resource user groups' " despite making it challenging for some people to qualify.**33** In *Alaska Fish & Wildlife Conservation Fund v. State* (*AFWCF II*) we

---

**30** *Id.* ("[A]ssuming that the exclusionary criterion is not per se impermissible, our decisions suggest that demanding scrutiny is appropriate."); *but see id.* at 12-13 (Moore, J., concurring) (reasoning that "close scrutiny" is appropriate); *State, Dep't of Fish & Game v. Manning*, 161 P.3d 1215, 1220-21 (Alaska 2007) (acknowledging that our decisions have not yet determined whether "close scrutiny" or "demanding scrutiny" is the appropriate test under the equal access clauses).

**31** *McDowell*, 785 P.2d at 9; *see id.* at 7 (citing *Gilman v. Martin*, 662 P.2d 120, 125 (Alaska 1983)) (rejecting argument that urban residents are not conclusively excluded from subsistence because they could move to rural area as inconsistent with equal protection clause); *see also State v. Kenaitze Indian Tribe*, 894 P.2d 632, 638 (Alaska 1995) (holding unconstitutional "proximity of domicile" factor for Tier II subsistence eligibility).

**32** 785 P.2d at 9. Our decision rested on two alternative grounds. We held that the use of residency as a criterion to exclude access to fish and game was per se unconstitutional. *Id.* We also held, in the alternative, that the use of residency as a criterion failed the means-to-ends scrutiny test for laws that "close[] participation to some, but not all" potential users of fish and game. *Id.* at 9-12. We reached that alternative conclusion because an Alaskan's residence does not have a strong correlation with their dependence on fish and game for subsistence. *Id.* at 10-12.

**33** *Alaska Fish & Wildlife Conservation Fund v. State* (*AFWCF II*), 347 P.3d 97, 102 (Alaska 2015) (quoting *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1318 (Alaska 1994)); s*ee also Manning v. State, Dep't of Fish & Game*, 355 P.3d 530, 536 (Alaska 2015) (*Manning II*) (holding that distinguishing between "subsistence *uses*, not *users*" does not trigger equal access scrutiny (emphasis in original)); *Interior Alaska Airboat Ass'n v. State, Bd. of Game*, 18 P.3d 686, 694-95 (Alaska 2001) (holding equal

upheld the criteria to obtain a community harvest permit for subsistence hunting of caribou, which required 25 or more people to share meat and salvage organs consistent with traditional subsistence practices.[34] We recognized it would be difficult for many Alaskans to meet these criteria to obtain the permit, but held that "inconvenience is not a bar to eligibility for participation, and it is therefore insufficient to raise a constitutional claim under the equal access clauses."[35]

### 2. Regulating residents and nonresidents differently does not, in itself, violate the equal access clauses.

Cassell's reliance on *McDowell* is unavailing. He argues that "[i]f it is unconstitutional to grant privileged access to game based on residence within Alaska, it is certainly constitutionally infirm to grant special privileges based on residence outside Alaska." To the extent Cassell suggests that allocating some of Alaska's fish and game for use by nonresidents on different terms than apply to residents confers a special privilege, the argument fails.[36] The *McDowell* decision struck down a law making some Alaskans ineligible for subsistence hunting and fishing based on the location of their residency.[37] But its holding — that using residency to limit access to fish and game violates the equal access clauses — involved a law distinguishing *between Alaskans*.[38]

---

access clauses not implicated by means and methods regulations); *Tongass Sport Fishing Ass'n*, 866 P.2d at 1318 (holding that the equal access clauses "are not implicated unless limits are placed on the admission to resource user groups").

[34] *AFWCF II*, 347 P.3d at 102.

[35] *Id.*

[36] Cassell seems to suggest this rule when he argues that it would be constitutional to allow both Alaska residents and nonresidents to apply for Kodiak brown bear permits on the same terms, but would be unconstitutional to reserve even a single bear permit for nonresidents while reserving all other permits for residents.

[37] *McDowell*, 785 P.2d at 9.

[38] *See id.*

*McDowell* does not bar treating Alaskans differently than residents of other states. "The individual interest in equal access to fish and game resources is a highly important interest running to each person *within* the state."[39] We explained in *AFWCF II* that the "equal access clauses are not implicated by a regulation that applies equally to all the State's citizens."[40] We applied this principle in *Shepherd v. State* to uphold a law that allowed the State to give priority to residents over nonresidents in big game hunting.[41] We reasoned that article VIII was not violated because "[r]esident and nonresident recreational users of Alaska fish and game are not similarly situated."[42] So long as all Alaskans are treated equally in fish and game regulations, unequal treatment of nonresidents does not conflict with article VIII.

### 3. The challenged regulation does not grant nonresidents a "special privilege" in violation of the equal access clauses.

Because granting nonresidents access to fish and game on different terms than residents is insufficient in itself to establish a "special privilege," Cassell must show the challenged regulation confers a special privilege on nonresidents for some other reason. But he fails to show that the regulation violates any of the equal access principles described in our decisions. The regulation does not exclude any Alaskan from the relevant user group: sport hunters of Kodiak brown bears. It does not treat some Alaskans differently than others. And although reserving some permits for

---

[39] *Gilbert v. State, Dep't of Fish & Game, Bd. of Fisheries*, 803 P.2d 391, 399 (Alaska 1990) (emphasis added) (internal quotation marks omitted).

[40] *AFWCF II*, 347 P.3d at 102.

[41] *See* 897 P.2d 33, 44 (Alaska 1995).

[42] *Id.* Cassell emphasizes our statement in *Shepherd* that in "cases of scarcity . . . the state may, and arguably is required to, prefer state residents to nonresidents." *Id.* at 40-41. But it does not follow that treating residents and nonresidents differently, in and of itself, violates the constitution.

- 13 - **7764**

nonresidents necessarily leaves fewer permits for Alaska residents, that fact alone does not mean the regulation specially advantages nonresidents in their pursuit of the bears.

Cassell asserts that reserving even a single permit exclusively for nonresidents grants nonresidents an unconstitutional "special privilege." We fail to see how. A permit to hunt a Kodiak brown bear is certainly a great privilege, but one that is offered to both residents and nonresidents.

To buttress his argument that reserving even a single permit for nonresident hunters is a special privilege, Cassell argues that "the permit is the resource," so each permit reserved for a nonresident is an impermissible special privilege to that resource on the basis of residency. This argument does not square with our precedent. In *AFWCF II* we explained that a regulation violates the equal access clauses if it places "limits . . . on the admission to resource user groups."[43] We have "consistently defined 'user groups' in terms of the nature of the resource (i.e., fish or wildlife) and the nature of the use (i.e., commercial, sport or subsistence)."[44] The resource at issue here is bears, not hunting permits. Permits are simply a tool for allocating resources. So the relevant "user group" for purposes of the equal access analysis is sport hunters of Kodiak brown bears. And the challenged regulation does not exclude anyone from this user group.

The mere act of reserving some hunting permits for nonresidents does not necessarily give them a better chance to win a permit and hunt a bear than residents have. Consider two different ways the State might allocate permits for Kodiak brown bears. First, the State could make all permits available to residents and nonresidents

---

[43]     *AFWCF II*, 347 P.3d at 102 (quoting *Tongass Sport Fishing Ass'n v. State*, 866 P.2d 1314, 1318 (Alaska 1994)).

[44]     *Id.* (quoting *Alaska Fish Spotters Ass'n v. State, Dep't of Fish & Game*, 838 P.2d 798, 803 (Alaska 1992)).

alike.[45]    Depending on the relative percentage of residents and nonresidents participating in the permit lottery, nonresidents could obtain a sizeable percentage of the permits.  Second, the State could reserve 1% of permits for nonresidents, allocating the other 99% to Alaska residents.  Cassell maintains this approach would be unconstitutional, but 1% of hunting permits for nonresidents hardly seems like a "special privilege" to hunt Kodiak brown bears.  In fact, nonresidents would likely receive fewer permits under the second system than under the first system.  Reserving a certain number of hunting permits for nonresidents does not inherently grant nonresidents a "special privilege" to participate in the hunt.

We do not rule out the possibility that, in some instances, allocating a high proportion of permits to nonresidents could confer a special privilege to the resource, even though residents were still allocated some permits.  But Cassell disclaims that argument in this case, asserting that "the constitutionality of a policy granting improper 'special privileges' does not turn on the precise statistical benefit conferred."

Moreover, the statistics Cassell points to do not, on their face, establish any kind of "special privilege" for nonresidents to hunt Kodiak brown bears.  Cassell suggests that nonresidents are privileged under the Board's regulation because of the statistical likelihood of an individual nonresident receiving a permit compared to that of an individual resident.  Roughly 5,000 resident applications are received each year, with an average of 331 residents receiving permits.  An average of 170 nonresidents receive permits each year.  Looking at the 2020 draw, Cassell puts the likelihood of receiving a permit for a resident at 6.6% and a nonresident at 55%.

Comparing the success rate of nonresident applicants to resident applicants, as Cassell does, is like comparing apples to salmonberries.  First, nonresidents may apply for only one permit each season, whereas residents "may apply

---

**45**    Cassell conceded that this approach is constitutionally permissible.

for up to six hunts for the same species . . . and may apply for the same hunt more than once."[46] This means that the number of resident *applications* may be much higher than the number of *residents* applying for a permit. Second, nonresidents must "present[] proof at the time of application that the applicant will be accompanied by a guide."[47] Evidence in the record indicates that the cost of hiring a guide to hunt a brown bear in Kodiak is over $20,000. So not only is it practically impossible for all but the wealthiest nonresident hunters to apply for a permit, even wealthy nonresident hunters cannot apply if they cannot hire a guide — and the record indicates that some guides are booked years in advance. By contrast, resident hunters do not need to hire a guide, and none are prevented from applying.

Given these differences, it is not obvious from the record that the challenged regulation gives nonresident hunters a "special privilege" to hunt Kodiak brown bears. An argument could be made that the Board's regulation favors Alaska residents by allocating more permits to them and not requiring them to hire an expensive guide — which is why so many more Alaskans apply for permits than nonresidents. In any event, Cassell has disclaimed any challenge based on statistical advantage, so it provides no basis to strike down the Board's regulation.

Cassell also argues that the challenged regulation confers an "impermissible grant of monopoly rights" on the "guiding industry." He cites our

---

[46] *See* 5 AAC 92.050(a)(2)(A) ("[A] person may not apply for more than six drawing permit hunts for the same species per regulatory year."); 5 AAC 92.061(a)(4)(A) (outlining special provisions for brown bear drawing permit hunts and providing that "an applicant for a guided nonresident drawing permit may apply for one such permit for fall hunts and one such permit for spring hunts").

[47] Nonresidents are required to have a guide under AS 16.05.407–.408. *See also* 5 AAC 92.061(a)(3) ("[T]he department may enter an application and issue a drawing permit for the general hunt only to a successful nonresident applicant who presents proof at the time of application that the applicant will be accompanied by a guide, as required under AS 16.05.407 or 16.05.408.").

decision in *Owsichek v. State, Guide Licensing & Control Board*, which struck down a law authorizing a state licensing board to establish areas in which a single hunting guide would have the exclusive right to operate.[48]

But the terms of the regulation challenged here do not authorize or grant special rights to individual hunting guides. Rather, they can be viewed as allocating some of the resource (Kodiak brown bears) to a *group* (professional hunting guides) that uses the resource commercially. The State "may, indeed must, make allocation decisions between sport, commercial, and subsistence users" of fish and wildlife.[49] To the extent that the challenged regulation could be viewed as an allocation of game resources to professional hunting guides, such an allocation would not contravene the equal access clauses.[50]

In sum, neither the differential treatment of residents and nonresidents, nor the allocation of some hunting permits to nonresidents, nor the allocation of some Kodiak brown bears to professionally guided hunting, violates the principle of equal access enshrined in article VIII of the Alaska Constitution.

**B.    The Challenged Regulation Does Not Violate The Constitutional Duty To Manage Resources For The Maximum Benefit Of Alaskans.**

In crafting article VIII, the delegates constitutionalized a policy of encouraging "the development of [Alaska's] resources by making them available for maximum use consistent with the public interest."[51]    Article VIII instructs the

---

[48]    763 P.2d 488 (Alaska 1988).

[49]    *McDowell v. State*, 785 P.2d 1, 8-9 (Alaska 1989).

[50]    As noted earlier, a portion of GMU 8 contains Kodiak National Wildlife Refuge, where the federal government operates a system of exclusive guide areas. Cassell has not argued that the interplay between the state regulation allocating hunting permits and the federal system of awarding guiding permits effectuates the kind of special privilege of using Alaska's game resources that contravenes our decision in *Owsichek*. Therefore we do not address this question in this decision.

[51]    Alaska Const. art. VIII, § 1.

legislature to manage "all natural resources belonging to the State . . . for the maximum benefit of its people."[52] And it requires that Alaska's replenishable resources, such as wildlife, "be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses."[53]

Cassell appears to argue that by reducing the number of Kodiak brown bear permits available to residents, the State is not managing the population to achieve maximum benefit for Alaskans. While Cassell values the intrinsic recreational benefit of hunting bears, this is not the only benefit Kodiak brown bears provide to Alaskans. Kodiak brown bears provide significant biological, cultural, and aesthetic benefits for Alaskans.[54] These bears may also be used to promote tourism, support livelihoods for professional guides, and generate user fees that help fund State wildlife management activities — all of which contribute to the regional and state economy.[55]

Cassell's argument challenges the balance of benefits that the State struck in establishing the regulation. The Alaska Constitution entrusts the legislature with the "duty to determine the procedures necessary for ensuring . . . the State's resources are used 'for the maximum benefit of its people.' "[56] Our review of such policy decisions is "limited to ensuring that the agency has taken a 'hard look' at all factors material and

---

[52] Alaska Const. art. VIII, § 2.

[53] Alaska Const. art. VIII, § 4.

[54] *See generally* JOHN L. BUCKLEY, PAPERS OF THE ALASKA CONST. CONVENTION, FOLDER 180.210.4, WILDLIFE IN THE ECONOMY OF ALASKA (1955) (assessing tangible recreational and commercial values of wildlife in Alaska, including nonresident expenditures).

[55] *See id.*

[56] *Sagoonick v. State*, 503 P.3d 777, 788 (Alaska 2022) (quoting *Sullivan v. Resisting Env't Destruction on Indigenous Lands* (*REDOIL*), 311 P.3d 625, 634-35 (Alaska 2013)).

relevant to the public interest."[57]  "We cannot say that an executive or legislative body that weighs the benefits and detriments to the public and then opts for an approach that differs from the plaintiffs' proposed [approach] would be wrong as a matter of law . . . ."[58]

We conclude that the Board of Game has taken a sufficiently hard look at the factors relevant to regulating Kodiak brown bear hunting for the maximum benefit of Alaskans.  We thus have no authority to impose, by judicial fiat, Cassell's view of maximum beneficial use.

**1.  The State may consider the economic benefits of competing uses of wildlife when making allocation decisions for the benefit of Alaskans.**

Cassell argues that the challenged regulation is the product of a constitutionally infirm balancing of interests.  He argues that although article VIII permits fish and other resources to be managed to achieve economic benefits for Alaskans, it treats wildlife differently.  Wildlife, Cassell argues, cannot be managed for the goal of economic benefit or revenue generation.  Rather, the State may manage wildlife only to ensure sustained yield of the resource and to provide non-economic consumptive uses for Alaskans.

We disagree.  The constitutional text, constitutional convention history, and our precedent support the conclusion that the State may consider economic benefits when deciding how to manage and allocate wildlife resources.

Cassell argues that the State is limited to managing wildlife for maximum resident access and sustained yield through allocation among user groups.  He notes that no specific provision of article VIII mentions economic benefits in connection with

---

**57**  *Id.* (quoting *REDOIL*, 311 P.3d at 635).

**58**  *Kanuk ex rel. Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1098 (Alaska 2014).

wildlife, even though economic considerations are alluded to in other provisions governing resources such as minerals and fish.[59]

This supposed contrast is not persuasive because the constitutional text pertaining to wildlife management is broad enough to permit management for economic gain.[60] Section 2's command to manage all resources for the "maximum benefit of [Alaska's] people" undoubtedly contemplates economic benefits for Alaskans.[61] Section 3 provides that both fish and wildlife are reserved to the people for "common use."[62] "Common use," like "maximum benefit," is a term broad enough to encompass economic uses and benefits. Section 4 provides that "[f]ish, forests, wildlife, grasslands, and all other replenishable resources belonging to the State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses."[63] The term "beneficial uses," like the other terms noted earlier,

---

[59] *See, e.g.*, Alaska Const. art. VIII, § 9 (permitting legislature to authorize sale of State lands); Alaska Const. art. VIII, § 12 (providing for mineral leases and permits on State lands); Alaska Const. art. VIII, § 15 (authorizing State to limit entry into fisheries "for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood, and to promote the efficient development of aquaculture in the State").

[60] *See West v. State, Bd. of Game*, 248 P.3d 689, 695 (Alaska 2010) ("When we interpret the Alaska Constitution, '[u]nless the context suggests otherwise, words are to be given their natural, obvious[,] and ordinary meaning.' " (alterations in original) (quoting *Hammond v. Hoffbeck*, 627 P.2d 1052, 1056 n.7 (Alaska 1981))).

[61] Alaska Const. art. VIII, § 2; *see, e.g.*, *Sagoonick*, 503 P.3d at 785-87 (explaining that Alaska legislature has prioritized economic development in resource management policy pursuant to its role under article VIII); *Kanuk*, 335 P.3d at 1097-98 (rejecting article VIII challenge to State emissions policies in part because "[t]he legislature — or an executive agency entrusted with rule-making authority in this area — may decide that employment, resource development, power generation, health, culture, or other economic and social interests militate against implementing what the plaintiffs term the 'best available science' in order to combat climate change").

[62] Alaska Const. art. VIII, § 3.

[63] Alaska Const. art. VIII, § 4.

plainly includes economic benefits. If it did not, then forests and other replenishable resources — which, like wildlife, are not mentioned by name elsewhere in article VIII — could be managed only for aesthetic, personal, or conservation benefits, not economic ones. It seems highly unlikely that is what the constitutional delegates intended,[64] given the size and importance of Alaska's timber industry at the time of statehood.[65] And we are not persuaded by Cassell's suggestion that Section 15's reference to "economic distress" in connection with the limited entry system for fisheries was intended to limit the scope of other constitutional provisions governing wildlife management. Rather, Section 15's reference to economic distress appears to pertain solely to the parameters of the limited entry system, which was unique to fisheries and in tension with the general policies of article VIII.[66]

Our precedent also recognizes that economically beneficial uses of wildlife are protected by the equal access clauses. In *Owsichek*, discussed above, we

---

[64] *See generally* JOHN L. BUCKLEY, PAPERS OF THE ALASKA CONST. CONVENTION, FOLDER 180.210.4, WILDLIFE IN THE ECONOMY OF ALASKA (1955) (assessing tangible recreational and commercial values of wildlife in Alaska, including nonresident expenditures).

[65] *See Se. Alaska Conservation Council v. U.S. Forest Serv.*, 443 F. Supp. 3d 995, 999 (D. Alaska 2020) ("In the 1950s, the Forest Service awarded several 50-year timber sale contracts in the forest to 'provide a sound economic base in Alaska through establishment of a permanent year-round pulp industry.' "); *id.* ("Two large pulp mills once operated on [Prince of Wales Island], where industrial scale logging occurred in the second half of the 20th century . . . ."); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 960-64 (9th Cir. 2015) (discussing Alaska's economic interests in timber harvest); *Se. Alaska Conservation Council, Inc. v. State*, 665 P.2d 544 (Alaska 1983) (upholding constitutionality of timber sale), *superseded by statute on other grounds*, ch. 86, § 1(b), SLA 2003.

[66] *See State v. Ostrosky*, 667 P.2d 1184, 1188-89, 1195 (Alaska 1983) (explaining that purpose of 1972 amendment to article VIII, § 15, which added phrase "to prevent economic distress," was to give State power to restrict entry into fisheries for economic and conservation purposes); *see also Grunert v. State*, 109 P.3d 924, 932-33 (Alaska 2005).

upheld a challenge to exclusive guide areas on the ground that this system violated the common use clause.[67] We held that awarding an exclusive area for professional guiding to a single hunting guide violated the common use clause even though other guides could still hunt recreationally in the same area.[68] Observing that "the public trust doctrine guaranteed fishermen access to public resources for 'private commercial purposes' as well as for recreation," we reasoned that "[t]he same rationale applies to professional hunting guides under the common use clause."[69] We concluded that "[t]he common use clause makes no distinction between use for personal purposes and use for professional purposes."[70] If the common use clause protects the use of wildlife for professional purposes, it stands to reason that the State may consider and promote professional uses of wildlife, which necessarily entails weighing the economic benefits of these uses against the benefits of other uses.

The implication of Cassell's argument is extreme. His theory, if accepted, would mean that the Board of Game is prohibited from considering the economic benefits of consumptive uses like guided hunting and trapping as well as nonconsumptive uses like wildlife viewing. We do not believe the constitutional delegates' vision for Alaska's wildlife was so narrow.

**2.      The economic and conservation justifications for the challenged regulation have support in the record and are reasonable.**

Cassell also disputes that the Board's conclusion that allocating permits in a way that benefits professional guides will promote economic benefits for Alaskans.

---

[67]     *Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 497-98 (Alaska 1988).

[68]     *Id.* at 497.

[69]     *Id.*

[70]     *Id.*

It is not our role to second-guess the Board's decisions on how to manage wildlife.[71] When agency decisions are challenged under article VIII "our role . . . is limited to ensuring that the agency has taken a hard look at all factors material and relevant to the public interest."[72] The Board appears to have taken a hard look at competing permit systems and their respective economic and conservation benefits.

First, the Board considered the system's impact on conservation. When the regulation was first adopted in 1976, the State explained that "the permit system represents an attempt to stabilize the harvest at a predictable level . . . . The relative success of resident and nonresident hunters is known and harvest can be predicted from a given number of permits to be issued." When the Board considered Cassell's proposal to allocate 90% of permits to Alaska residents only, ADF&G biologists explained the effects that change would have on the ratio of female bears harvested and the overall population. ADF&G also explained that guided hunts are generally more successful than unguided hunts, while taking a higher percentage of older male bears — reducing the hunt's impact on the population's sustainability. One Board member explained that:

> [Cassell's] proposal would seriously disrupt the current system, and it could take years, if not decades to again find an appropriate balance. Along with the biological impacts noted by [ADF&G], there will undoubtedly be severe negative economic impacts on individuals, communities, [ADF&G], and the state . . . . I think the existing Kodiak bear hunting system provides adequate opportunity for residents. It's good for the bear population, and it provides the maximum benefit for the people.

---

**71** *Cf. Kanuk ex rel. Kanuk v. State, Dep't of Nat. Res.*, 335 P.3d 1088, 1098 (Alaska 2014) ("We cannot say that an executive or legislative body that weighs the benefits and detriments to the public and then opts for an approach that differs from the plaintiffs' proposed 'best available science' would be wrong as a matter of law . . . .").

**72** *Sagoonick v. State,* 503 P.3d 777, 788 (Alaska 2022) (internal quotation marks omitted).

Second, the Board considered potential economic benefits of guided hunting. The Kodiak Advisory Committee reported to the Board that "[t]he Kodiak Brown Bear is a 'non-meat animal,' thus it is not managed to maximize as a food source. Therefore, priority management is for economic and intrinsic value." It took the position that managing " '[f]or the maximum benefit of the people' should thus involve a high percentage of nonresident guided hunters which clearly maximizes the economic value of the Kodiak bear." It noted that "[c]urrently 97% of active professional guides registered in Unit 8 are Alaskan residents"; that "185 non-resident hunts @ $22,500.00 per hunt equals an additional 4.16 million dollars infused into Alaska's economy"; and that "[n]onresident expenditures are exponentially higher than th[ose] of . . . self-guided resident hunt[ers]. Guided hunts have higher per hunt costs such as employees, transportation, fuel, food, equipment, permitting and advertising."

The chairman of the Board voiced these considerations when rejecting Cassell's proposal:

> I'm not going to support it. As Member Turner pointed out, this isn't just a guide issue, this is a . . . Kodiak economy issue. And there's a lot of the people that have . . . hotels, restaurants and so forth that derive . . . part of their income from this . . . . I know that the nonresidents pay a lot of money for trespass access fees and so forth to [Alaska] Native Corporations.

This record shows that the Board took a hard look at both conservation and economic benefits of guided hunting by nonresidents when deciding to keep its permit system. Therefore we reject Cassell's argument that the Board violated its trust duty to manage hunting of Kodiak brown bears for the maximum benefit of Alaskans.

## V.    CONCLUSION

We AFFIRM the judgment of the superior court.